UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

RICARDO IGNACIO GILL,

          Petitioner,

vs.                                        Case No. 3:18-cv-725-BJD-JBT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

          Respondents.

_____

## **ORDER**

### **I.  Status**

Petitioner Ricardo Ignacio Gill, a Florida prisoner convicted and sentenced to death, filed a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Petition) (Doc. 30, 187 pages).[1]  Petitioner contends he is entitled to equitable tolling of the limitation period to file a federal habeas petition and he claims actual innocence.[2]  Id. at 15-24.  The operative response is the

---

[1] The Court will refer to the Appendices attached to the Petition as (Docs. 30-1, 30-2, 30-3). The Court references the page number assigned by the electronic filing system for each Appendix.

[2] The Court references the page number assigned by the electronic filing system for the Petition, Second Response, Petitioner's Response, Reply, and Surreply.  Petitioner filed an Unopposed Notice of Filing State Court Records (Doc. 75).  The Court will refer to the Records as "Rec."  The Court references the page number assigned by the electronic filing system for these Records.

Second Motion to Dismiss the Federal Habeas Petition as Untimely (Second Response) (Doc. 62).[3]   Respondents submit that the Petition is untimely filed, and Petitioner is not entitled to equitable tolling as he caused his own delay, he was not diligent, he was found to be competent by numerous doctors over the years, including at the time of trial and sentencing and during the state post-conviction proceeding, and there are no extraordinary circumstances.   Id. at 12-16.   They also contend the actual innocence exception does not apply to Petitioner.   Id. at 17-18.

Petitioner filed a Response to Respondents' Second Motion to Dismiss Federal Habeas Petition as Untimely (Petitioner's Response) (Doc. 81).[4]   He seeks equitable tolling and claims it is warranted as he was diligent as could

---

[3] The Court will refer to Respondents' Exhibits (Docs. 60 & 72) as "Ex."   The Court will, where applicable, refer to the page number at the bottom center of each page of the exhibit. To say the least, the record submitted to this Court is not user friendly as it is not presented in sequential order and has been provided in a piecemeal fashion by both parties.   For their submission, Respondents note: "the record is not necessarily in chronological order, the tab numbers in this checklist may appear out of chronological order."   (Doc. 60 at 1).   As noted, the tabs on the checklist appear out of order, and the tabs are actually not in sequential order. In order to rectify some of the confusion caused by the lack of chronology in this record, the Court has elected to reference the page numbers as indicated, not the tabs.

[4] Petitioner refers to PageID #s.   See (Doc. 81).   The page identification numbers are not the page numbers assigned by the electronic filing system.   The page numbers assigned by the electronic filing system are found at the top of the page and are simply referenced as "Page" and the number.   The PageID # tracks every page of every document filed in the case beginning with page one of the first document; therefore, the Court will reference the page number assigned by the electronic filing system for Petitioner's Response, not the PageID #.

be expected from a person suffering a brain defect and there are extraordinary circumstances (congenital brain defect that renders him incompetent, he was incompetent during post-conviction proceedings, and post-conviction counsel was deficient in this regard). Id. at 6-7. In Respondents' Reply (Doc. 86), they assert Petitioner fails to rebut the presumption of correctness under 28 U.S.C. § 2254(e)(1) and he is not entitled to equitable tolling. Id. at 2. Also, Respondents address Petitioner's substantive claim of incompetency. Id. at 9-19. In Petitioner's Surreply (Doc. 90), he reiterates that the removal of counsel and dismissal of Petitioner's case were extraordinary circumstances that caused the late filing of the Petition. Surreply at 6.

As acknowledged by the parties, the Petition is untimely filed, filed well beyond the Antiterrorism and Effective Death Penalty Act (AEDPA) one-year statute of limitations. Petition at 17-18; Second Response at 2-3.

## II. Timeliness

Respondents assert the Petition is untimely. Petitioner concedes that the Petition was filed beyond the AEDPA one-year statute of limitations. Under AEDPA, there is a one-year period of limitation:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

3

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Pursuant to AEDPA, effective April 24, 1996, Petitioner had one-year to file a timely federal petition pursuant to 28 U.S.C. § 2254.   Wilcox v. Fla. Dep't of Corr., 158 F.3d 1209, 1211 (11th Cir. 1998) (per curiam) (one-year from date of enactment is adopted for convictions that became final prior to the effective date of AEDPA), cert. denied, 531 U.S. 840 (2000); see Guenther v.

4

Holt, 173 F.3d 1328, 1331 (11th Cir. 1999), cert. denied, 528 U.S. 1058 (2000) (same).   Review of the record shows Petitioner failed to comply with the limitation period described above.

After judgment and conviction, Petitioner appealed to the Florida Supreme Court (FSC).   Ex. at 964, 966, 2227-2346.   On July 9, 2009, the FSC affirmed.   Id. at 2348-87.   Gill v. State, 14 So. 3d 946 (Fla. 2009) (per curiam). The mandate issued on July 30, 2009.   Ex. at 2388.   The conviction became final on October 7, 2009 (90 days after July 9, 2009) (According to rules of the Supreme Court, a petition for certiorari must be filed within 90 days of the appellate court's entry of judgment on the appeal or, if a motion for rehearing is timely filed, within 90 days of the appellate court's denial of that motion.").

The limitation period began running and ran for 362 days until Petitioner, through counsel, filed a Rule 3.851 motion on Monday, October 4, 2010.   Ex. at 2436-73.   Respondents state, "this properly filed motion acted to toll the federal limitations clock."[5]   Second Response at 2.   In an order filed July 18, 2011, the circuit court dismissed the post-conviction proceeding and discharged post-conviction counsel.   Ex. at 2640-42; Rec. at 139-41.   The FSC

---

[5] The Court assumes arguendo that the period was tolled as Respondents do not dispute that period of tolling.

affirmed the circuit court's decision finding Petitioner competent to discharge his post-conviction counsel and waive post-conviction proceedings.   Gill v. State, 107 So. 3d 326, 328 (Fla. 2012); Ex. at 2832-35.   The record demonstrates Petitioner filed a pro se motion for extension of time to file a motion for rehearing on October 26, 2012 pursuant to the mailbox rule.   Rec. at 23-25.   On November 28, 2012, the FSC denied the motion as untimely. Id. at 22. Petitioner followed up with a December 6, 2012 pro se motion for rehearing.   Id. at 5-21.   On January 14, 2013, the FSC struck the pro se motion for rehearing as unauthorized.   Id. at 4.

In his procedural history, Petitioner states the FSC denied rehearing on Thursday, January 23, 2013.   Petition at 17-18.   The Petition, Second Response, and the record provided to the Court are not a model of clarity on this point.   Petitioner states the FSC denied rehearing on January 23, 2013, but he also states the FSC struck Petitioner's pro se rehearing motion. Petition at 17-18; 41.   Respondents state the Court struck Petitioner's pro se motion on January 14, 2013, but make no reference to a motion for rehearing denied on January 23, 2013.   Second Response at 3; see Rec. at 4-21.   The FSC docket for Case Number SC11-1553 does not reference an additional motion for rehearing and a rehearing denied on January 23, 2013.   Therefore,

the Court assumes this is simply an error which followed from Petitioner considering the published decision.[6]

The FSC struck Petitioner's pro se motion for rehearing on Monday, January 14, 2013.   Respondents submit that the clock began running on Tuesday, January 15, 2013 and expired three days later on Friday, January 18, 2013.[7]   However, with a few days remaining in the one-year period, Petitioner did not file his federal petition until Monday, November 4, 2019, years later.   He readily admits his petition is several years late.   Petition at 18.

Based on the history outlined above, the Petition filed on November 4, 2019 is untimely and due to be dismissed unless Petitioner can establish equitable tolling of the statute of limitations is warranted.   Alternatively, Petitioner claims actual innocence.   The Court will briefly address the contention of actual innocence.

---

[6] After reviewing the published decision of Gill, 107 So. 3d 326, it states rehearing denied January 23, 2013; however, there is no rehearing denied on January 23, 2013 on the official FSC docket (SC11-1553).   Furthermore, after investigation, the archives (SC11-1553) do not include a rehearing denied on that date.

[7] Since Respondents do not assert that the unauthorized motion for rehearing did not toll the one-year period, the Court assumes for the purposes of this opinion that it did toll.   As the Petition was filed many years later, this is a difference without any real distinction.

Upon review, Petitioner does not demonstrate that he has new evidence establishing actual innocence. He has not pointed to any evidence demonstrating it is more likely than not that no juror, acting reasonably, would have found him guilty beyond a reasonable doubt in light of new evidence. See McQuiggan v. Perkins, 569 U.S. 383, 395 (2013) (restricting the miscarriage of justice exception to a severely confined category of cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted the petitioner).

Petitioner has made no attempt to make a credible showing of actual innocence by offering new evidence that is directly probative of his innocence. Instead, he asserts he has uncovered evidence establishing he is innocent of the capital crime because he was insane at the time the crime was committed. Petition at 21. Petitioner points to his lifelong history of profound mental illness, his significant brain defect, and the overarching claim he was insane at the time the crime was committed.

Although Petitioner claims mental illness, temporal lobe impairment, and insanity at the time the crime was committed, he is required to show factual innocence, not mere legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998). See Rozzelle v. Sec'y Fla. Dep't of Corr., 672 F.3d 1000,

1012-13 (11th Cir. 2012) (per curiam) (finding factual innocence is required but recognizing that the circuits differ on whether a complete affirmative defense, such as insanity, shows factual or only legal innocence), <u>cert. denied</u>, 568 U.S. 914 (2012).   To the extent this Court broadly construes the Petition as claiming legal innocence, not factual innocence, that will not win the day.

Although the question of whether the establishment of an affirmative defense would qualify under <u>Schlup v. Delo</u>, 513 U.S. 298 (1995) has not been resolved in the Eleventh Circuit, dicta in <u>Rozzelle</u> suggests that the Eleventh Circuit would not extend a claim of this nature to satisfy the actual innocence requirement as the exception is extremely rare, only applies to extraordinary cases, and has been considered very narrow - for those rare situations where the state has convicted the wrong person.   <u>Rozzelle</u>, 672 F.3d at 1014-15. Considering the current state of the law, Petitioner has not made a credible showing of actual innocence.

## III.   Introduction

Petitioner places his mental health at issue.   Therefore, he has waived any privilege in any confidential materials related to his mental health and medical records as these matters are relevant to Petitioner's contentions concerning his mental health and brain defect:

9

> "'[c]ourts have routinely held that, by putting one's medical condition at issue in a lawsuit, a plaintiff waives any privilege to which he may have otherwise been entitled as to his privacy interests in his medical records.'" <u>Lozman v. City of Riviera Beach</u>, No. 08-80134-Civ-Hurley/Hopkins, 2014 WL 12692766, at *1, 2014 U.S. Dist. LEXIS 195855, at *3-4 (S.D. Fla. May 2, 2014) (quoting <u>Stogner v. Sturdivant</u>, 2011 U.S. Dist. LEXIS 107571, 2011 WL 4435254, *5 (M.D. La. Sept. 22, 2011)); <u>Barlow v. Dupree Logistics, LLC</u>, No. 1:14-BE-1808-E, 2015 WL 4646812, at *8, 2015 U.S. Dist. LEXIS 102371, at *24 (N.D. Ala. July 5, 2015)[.]

<u>Oldaker v. Giles</u>, No. 7:20-CV-00224 (WLS), 2021 WL 3412551, at *3 (M.D. Ga. Aug. 4, 2021) (slip op.), <u>reconsideration denied</u>, 2021 WL 3779837 (M.D. Ga. Aug. 25, 2021).[8]

Although this case is a criminal case, not a civil case for damages, the medical and mental health records are directly relevant to several claims set forth in the Petition, and Petitioner, through the filing of his Petition, raised the matter at issue and asks the Court to address all of his claims.   Of note, a massive amount of sensitive information is already a matter of public record due to the extensive records contained in the criminal and post-conviction

---

[8] The Court finds the reasoning of <u>Oldaker</u> persuasive on this point.   <u>See</u> <u>McNamara v. Gov't Emp. Ins. Co.</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022) (reiterating that unpublished opinions may be cited as persuasive authority but are not binding precedent.   <u>See</u> Rule 32.1, Fed. R. App. P.   In this opinion, the Court finds other unpublished decisions persuasive on various points and references them as persuasive authority, not as binding precedent.

record.   See United States v. Bradley, No. 405CR059, 2007 WL 1703232, at *5 (S.D. Ga. June 11, 2007) (not reported in F.Supp.2d) (discussing privacy interests after a criminal trial).

## IV.   Equitable Tolling

The AEDPA is applicable to Petitioner's case as his conviction became final after April 24, 1996, the effective date of AEDPA.   Smith v. Jones, 256 F.3d 1135, 1143 (11th Cir. 2001) (by its terms, the state of limitations provision in AEDPA bars any petition filed more than a year after the conviction became final at the conclusion of direct appeal, absent exceptions and qualified tolling periods), cert. denied, 534 U.S. 1136 (2002).   The AEDPA one-year limitation period is subject to equitable tolling.   Holland v. Fla., 560 U.S. 631, 651-52 (2010).

Petitioner submits he can establish that equitable tolling of the statute of limitations is warranted, claiming extraordinary circumstances beyond his control.   Petitioner carries the burden of persuasion.   He must satisfy a two-pronged test; he must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing."   Id. at 649 (quotation marks omitted).   See Christmas v. Judd, No. 20-14431, 2021 WL 4860927, at *1 (11th Cir. Oct. 19,

11

2021) (per curiam) (not reported in Fed. Rptr.) (same).   Petitioner contends his brain defect with brain damage and mental illness and incapacity satisfies both prongs: the diligence prong, and the extraordinary circumstances prong. Alternatively, he claims his incompetence combined with counsel's failure to offer evidence on incompetency satisfies both prongs.

Equitable tolling is an extraordinary remedy, only employed in "rare and exceptional circumstances and typically applied sparingly."   Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1221 (11th Cir. 2017) (quotations and citation omitted), cert. denied, 138 S. Ct. 1042 (2018).   See Downs v. McNeil, 520 F.3d 1311, 1318 (11th Cir. 2008) (finding equitable tolling "is a remedy that must be used sparingly").   This heavy burden is not easily surmounted.

Petitioner did not file his federal Petition (Doc. 30) until Monday, November 4, 2019, well past the expiration of the one-year limitation period.[9] The Petition filed on November 4, 2019 is untimely and due to be dismissed unless Petitioner can establish equitable tolling of the statute of limitations is warranted.   Petitioner must demonstrate both that he diligently pursued his federal habeas rights and extraordinary circumstances prevented his timely filing of a federal habeas petition.   Thus, in order to obtain equitable tolling

---

[9]  Petitioner is represented by counsel.

for the period at issue, not only must Petitioner show extraordinary circumstances he must also demonstrate those circumstances caused him to miss the filing deadline.

Petitioner argues the specific circumstances of the case warrant equitable tolling.   Petition at 18.   He references a profound brain defect (arterial venous malformation or AVM) with brain damage and mental illness and incapacity.   Id. at 15-21.   He argues that courts have widely recognized that equitable tolling applies when a defendant suffers some form of mental incapacity (citing Lawrence v. Fla., 421 F.3d 1221, 1227 (11th Cir. 2005); Nara v. Frank, 264 F.3d 310, 320 (3d Cir. 2001), overruled in part on other grounds, Carey v. Saffold, 536 U.S. 214 (2002); and Hunter v. Ferrell, 587 F.3d 1304, 1308-10 (11th Cir. 2009) (per curiam)).   Petition at 19.

"To obtain equitable tolling, . . . Petitioner must show extraordinary circumstances and demonstrate that those circumstances **caused him to miss the filing deadline**."   Ryder v. Sec'y, Dep't of Corr., No. 8:09-CV-2019-T-27MAP, 2012 WL 12895353, at *4 (M.D. Fla. June 6, 2012) (not reported in F. Supp.) (citations omitted).   In the instant case, the one-year limitation period expired on January 18, 2013, four days after Petitioner's pro se motion for rehearing filed in the FSC was stricken as unauthorized on January 14, 2013.

13

To prevail on his contention that he is entitled to equitable tolling, Petitioner must show there is a causal connection between the alleged extraordinary circumstances and the late filing of his federal petition.   Petitioner contends equitable tolling is warranted because he suffers from some form of mental incapacity that satisfies the two-pronged standard.

In <u>Hunter</u>, 587 F.3d at 1308, the Eleventh Circuit focused on whether the petitioner had presented sufficient evidence to create a factual issue as to a causal connection between his mental incapacity and his ability to file a timely federal petition.   The Eleventh Circuit looked to its previous decision in <u>Lawrence</u>, 421 F.3d at 1226-27, in which the court determined that the petitioner's claim of long-term mental impairments combined with a full-scale IQ of 81 were insufficient to justify equitable tolling because they did not establish a causal connection between the alleged mental incapacity and the ability to file a timely petition.   <u>Hunter</u>, 421 F.3d at 1308.   The Eleventh Circuit, while noting that "mental impairment is not *per se* a reason to toll a statute of limitations[,]" <u>Hunter</u>, 587 F.3d at 1308, concluded the petitioner had presented sufficient evidence to warrant further inquiry based on record evidence of severe, irreversible mental retardation.   <u>Id</u>. at 1309-10.   In <u>Nara</u>, 264 F.3d at 320, the Third Circuit deemed an evidentiary hearing warranted

because of ongoing periods of mental incompetency which may constitute an extraordinary circumstance to justify equitable tolling.

In O'Connor v. Inch, No. 17-60234-CV-COHN/REID, 2019 WL 11029408, at *2 (S.D. Fla. Sept. 24, 2019) (slip op.), the petitioner argued equitable tolling was appropriate because he suffers from mental illness, he was effectively abandoned by counsel, and he was deprived of personal property and legal materials during transfers between facilities.   In pertinent part, the court held: "[m]ental impairment, without a showing of how such impairment affects a petitioner's ability to file a timely petition, is insufficient reason to equitably toll the limitations period under the AEDPA."   Id. at *3 (citing Lawrence (contention that individual suffered from mental illness all his life is not sufficient reason to justify equitable tolling) and Hunter).

In Petitioner's Response, he sets forth other circumstances he claims justify equitable tolling:   (1) he suffers from a congenital brain defect that renders him incompetent and unable to make decisions on his own behalf, and this incompetency contributed to the late filing because Petitioner cannot internally process emotions and apply information to himself; (2) he was incompetent when the post-conviction court removed counsel and dismissed the post-conviction proceedings; and (3) post-conviction counsel was deficient

in failing to offer any evidence on incompetency.   Petitioner's Response at 61-62.   Petitioner contends he showed "the diligence expected of someone 'in his situation[.]'" Id. at 62 (citation omitted).   Apparently, Petitioner contends his mental illness/brain defect satisfies both the diligence and extraordinary circumstances prongs.

There are several factors that stand out to the Court.   On October 12, 2009, Petitioner suffered a hemorrhage in his brain and underwent surgery on October 13, 2009: a frontotemporal craniotomy.[10]   (Doc. 30-2 at 9).   This neurological event occurred five days after his conviction became final on Wednesday October 7, 2009.   Thus, a very significant event effecting both Petitioner's physical and mental health occurred at the outset of his one-year limitation period.   On January 15, 2010, Petitioner was admitted to the Crisis Stabilization Unit (CSU) in the Florida Department of Corrections (FDOC) upon emergent transfer to Union Correctional Institution (UCI) and placed on

---

[10] To provide context, the Court briefly outlines Petitioner's medical history concerning the AVM.   A brain bleed occurred on March 20, 2004, confirmed by an MRI (magnetic resonance imaging) performed on March 22, 2004.   (Doc. 30-2 at 7-8).   By June 30, 2004, a doctor at Memorial Hospital, Jacksonville, Florida, recommended surgery.   Id. at 8.   Petitioner told the circuit court about his brain bleed and need for surgery at a hearing on February 18, 2005.   Ex. at 1247.   A doctor at Shands recommended radiation treatment.   (Doc. 30-2 at 8).   On January 24, 2006, Petitioner received radiosurgery.   Id. at 9.   An MRI of Petitioner's brain on October 12, 2009 showed a large multiloculated hemorrhagic lesion in the left temporal lobe, measuring 5.1 x 4.7 cm at the largest point, while also suggesting hemosiderin, or prior recent hemorrhage.   Id.

Self Harm Observation Status (SHOS). (Doc. 30-3, Vol. 2 at 21-25, 33).   He was placed in chronic clinic for his psychiatric disorder.[11]   (Doc. 30-3 at 15, 20).

Also of significance, the circuit court did not order an assignment to a death qualified judge for the purposes of Petitioner's post-conviction proceeding and appoint counsel for Petitioner until the circuit court's orders were entered on February 1, 2010 and filed on February 5, 2010.   Ex. at 2426-27.   Thus, 121 days of the one-year period ran without action being taken by the circuit court to ensure a qualified judge was assigned to the case and counsel appointed to represent Petitioner for his post-conviction proceedings. Petitioner's discharge diagnosis of April 14, 2010 mentions a seizure disorder and an AVM of the cerebral cortex area.[12]   (Doc. 30-3 Vol. 1 at 75).

Petitioner's signature is not on the original Rule 3.851 motion filed on October 4, 2010.   Id. at 2436-63.   The circuit court dismissed the Rule 3.851 motion without prejudice to Petitioner filing an amended motion.   Id. at 2562-63.   Petitioner's post-conviction counsel, Mr. D. Todd Doss, filed a Motion for

---

[11]  Petitioner states he was committed to in patient mental health care for over three months. Petitioner's Response at 42.   Of note, "[i]nmate records are remarkable for mental health emergencies during the last six months on 01/12/10, 01/13/10, and 4/22/10, resulting in SHOS/IMR and CSU admission."   (Doc. 30-3, Vol. 2 at 81).

[12]  Harry Krop, Ph.D. (psychologist) wrote Petitioner's counsel a letter on January 30, 2006, stating Petitioner has had at least one Grand Mal seizure and at age 14 was knocked unconscious in a car accident.   Ex. at 2032-33.

Extension of Time to Amend Motion for Post-conviction Relief, noting that
Petitioner refused to come out of his cell to meet with counsel and his
investigator.   <u>Id</u>. at 2584-85.   Mr. Doss further noted, "Mr. Gill has exhibited
erratic behavior throughout this litigation involving undersigned counsel."
<u>Id</u>. at 2585.   Counsel mentioned Petitioner's letters threatening the court and
counsel and Petitioner's pro se pleadings attempting to dismiss counsel.   <u>Id</u>.
Those matters, "coupled with privileged correspondence causes the
undersigned to seriously question the competence of Mr. Gill."   <u>Id</u>.   Counsel
requested an extension of time to have Petitioner examined for competency
and to amend the motion for post-conviction relief to comply with the oath
requirement.   <u>Id</u>.

The circuit court granted counsel's motion for extension of time and
ordered a competency evaluation with a hearing.   <u>Id</u>. at 2590-91.   The court
explained that if Petitioner is found to be competent, the court will then
conduct a <u>Durocher/Faretta</u> [13] inquiry to determine whether Petitioner
knowingly, freely, and voluntarily wants to dismiss the proceedings and

---

[13] <u>Durocher v. Singletary</u>, 623 So. 2d 482, 485 (Fla. 1993) (per curiam) (requiring an
evaluation as to whether a defendant understands the consequences of waiving collateral
counsel and proceedings); <u>Faretta v. Cal.</u>, 422 U.S. 806 (1975) (requiring a hearing on a
defendant's unequivocal request for self-representation).

discharge counsel.   Ex. at 2590-91.   The court entered a separate Order Appointing Expert(s) for Competency Evaluation and Scheduling Hearing, appointing Dr. Krop and Dr. Brian Cooke.   Id. at 2596-97.

On June 9, 2011, Dr. Cooke responded that Petitioner refused to be evaluated, resulting in Dr. Cooke being unable to make an opinion with reasonable medical certainty regarding Petitioner's present capacity to dismiss the proceedings and discharge counsel.   Id. at 2599-2604.   On May 31, 2011, Dr. Krop provided a report that stated he was able to evaluate Petitioner.   Id. at 2607-2609.   Dr. Krop estimated Petitioner to be functioning in the average range of intelligence with no current evidence of a psychotic process and his reality testing appeared intact.   Id. at 2608.   Dr. Krop made a competency assessment and found Petitioner met the following: (1) appreciation of charges or allegations against him; (2) appreciation of range and nature of possible penalties; (3) understanding of the adversarial nature of the legal process; (4) ability to disclose pertinent facts to counsel; (5) ability to manifest appropriate courtroom behavior; and capacity to testify relevantly and coherently.   Id.

In conclusion, Dr. Krop wrote:

> Based on the totality of this evaluation, it is this examiner's opinion that Mr. Gill is not currently suffering with any major mental illness and is **Competent to Proceed** in all legal proceedings.

> Although the Defendant may change his mind in the future, it appears that his current though processes are rational and reality based.  Although he is situationally depressed, he is capable of assisting his attorney if he so chooses as well as representing his decisions to the Court.

Id. at 2609.

A competency hearing was conducted on June 30, 2011.  Id. at 2665. Dr. Cooke was able to evaluate Petitioner at the Courthouse on June 30, 2011, and provide a psychiatric opinion.  Id. at 2675.  Dr. Cooke examined relevant documents.  Id. at 2689-90.  He found Petitioner has the capacity to understand the adversarial nature of the legal process and the collateral proceedings, and found Petitioner had the ability to disclose to counsel facts pertinent to the proceeding.  Id. at 2690-91.  Dr. Krop saw Petitioner on June 30, 2011, and he attested everything he observed again supported his original assessment that Petitioner is competent to proceed.  Id. at 2695-96.

Petitioner's post-conviction counsel, Mr. Doss, followed up with a Memorandum Regarding Mr. Gill's Competency to Waive Post-conviction Appeals and Discharge Counsel, filed July 7, 2011.  Id. at 2631-38.  He reiterated his objection to Dr. Cooke being accepted as an expert; moved the court to order the release of Petitioner's FDOC records, although Petitioner had revoked his release; and argued Petitioner has an inability to understand

and function in an attorney-client relationship, demonstrating an inability to disclose pertinent facts to counsel, to comprehend advice and make decisions. Id.   Counsel complained that the evaluations were incomplete and a decision as to competency should not be rendered.   Id. at 2636.   He asked that the court release the prison records to the doctors, order a further evaluation, and conduct another competency hearing.   Id. at 2637.   Alternatively, Mr. Doss asked that Petitioner be found incompetent to proceed.   Id.

On July 12, 2011, the court entered an order filed on July 18, 2011, finding Petitioner's testimony at the evidentiary hearing supported the competency finding of the two experts, and acknowledging Petitioner's stated desire to end the post-conviction process and discharge counsel.   Id. at 2640-41.   The court noted that the experts were not appointed "due to any belief by this Court that Defendant was incompetent."   Id. at 2640.   The court dismissed the post-conviction proceedings and discharged counsel.   Id. at 2641.

Mr. Doss filed a notice of appeal and Petitioner filed a pro se notice of appeal.[14]   Id. at 2644-45, 2654.   Mr. Doss filed the Initial Brief of Appellant.

---

[14]  The Court finds this evinces diligence on Petitioner's part.   Petitioner did not file a pro se brief, but Mr. Doss filed briefs on Petitioner's behalf.

Id. at 2739-61.   The state filed an Answer Brief of Appellee.   Id. at 2763-2822.
Mr. Doss filed a Reply Brief of Appellant.   Id. at 2824-30.   The FSC
affirmed.[15]   Id. at 2832-35; Gill, 107 So. 3d 326.

The record demonstrates Petitioner suffers from a congenital brain
defect, he has lesions on the brain, and this combined with ongoing mental
illness satisfies both the diligence and extraordinary circumstances prongs.
The Court has reviewed the extensive medical and mental health records and
concludes Petitioner has carried his burden of establishing a basis to invoke
equitable tolling in order to resuscitate his untimely petition.   Due to the
comprehensive nature of the records received by the Court concerning
Petitioner's extreme mental health issues exhibited from childhood to present
day and Petitioner's AVM, brain pathology and defect, the Court finds an
evidentiary hearing is unnecessary.

It is quite apparent, "mental illness can constitute an extraordinary
circumstance, which may prevent a habeas petitioner from understanding and
acting upon his legal rights and thereby equitably toll the AEDPA limitations
period" but it does not per se toll the limitations period.   Riva v. Ficco, 615

---

[15] The FSC set a briefing schedule assuming that Petitioner and Doss would file briefs, but
Petitioner did not file a pro se brief.   Gill, 107 So. 3d at 327.

F.3d 35, 40 (1st Cir. 2010).   There must be a showing of "some causal link between a petitioner's mental illness and his ability seasonably to file for habeas relief."   Id.   Of import, in Riva, the court found the causation requirement would be satisfied if a petitioner shows that, during the relevant time frame, he both suffered from a mental illness or impairment that severely impaired his ability "either effectively to pursue legal relief to his own behoof or, if represented, effectively to assist and communicate with counsel."   Id.

The record shows Petitioner suffers from long-standing mental illness, with Petitioner being removed from pre-school and committed to facilities as a child and a teenager and being otherwise institutionalized for years, suffering from what was diagnosed as childhood schizophrenia, conduct disorder-aggressive, and ADD.   In his youth, Petitioner was repeatedly psychiatrically placed and institutionalized exhibiting impulsive, violent, manipulative, and possibly delusional behavior.   Over the years he has been diagnosed with an array of disorders and psychiatric issues, including, major depressive disorder with psychotic features or Dysthymia; Attention Deficit Disorder (ADD); Asperger's; Antisocial Personality Disorder or Borderline Personality Disorder; Psychosis, NOS; mood disorder, NOS; Bipolar I Disorder; brain pathology or neurologically based sociopathology; major mood disorder; intermittent

explosive disorder; seizure D/O; and polysubstance dependence. Yes, there are points in the record where Petitioner exhibits his intelligence, shows lucidity, and demonstrates that he is educated; however, these periods are intermittent and interspersed with significant periods of erratic behavior and health crises.

Of course, Petitioner's mental health situation has been exacerbated by very significant neurological events: headaches, seizures, brain hemorrhages, the pressure of the AVM (a congenital abnormality) on the amygdala (the structure in the brain controlling rage and impulse), and the aftermath of these significant neurological events, including headaches, seizures, apparent delusions, falls, and vision issues. Also, there was a significant period where the state court failed to provide counsel to Petitioner, who had undergone brain surgery and then entered a mental health crisis stabilization unit of the FDOC under SHOS. Once the court appointed post-conviction counsel, Petitioner exhibited his erratic and threatening behavior, prompting counsel to seek an extension of time for a competency proceeding, triggering the state court's appointment of experts and then a competency proceeding.

Petitioner has shown that his mental illness and brain defect prevented him from following through in litigation in a sustained way. His illness and

his explosive and erratic behavior often prevented him from cooperating with counsel. Additionally, his significant neurological issues exacerbated the difficulties he was facing due to mental illness.

The record demonstrates that for almost a third of the one-year limitation period Petitioner was without post-conviction counsel and he suffered, almost immediately, a significant neurological event, a hemorrhage in his brain and underwent a frontotemporal craniotomy on October 12, 2009.[16] Petitioner's Response (Doc. 81-2 at 23-24; Doc. 81-3 at 69).[17]   On November 9, 2009, medical issued a pass for a seizure helmet after Petitioner complained of blurred vision and falling. Id. (Doc. 81-2 at 84; Doc. 81-3 at 107). On November 10, 2009, Petitioner had a seizure assessment after he had a seizure lasting a few minutes and fell forward against a wall. Id. (Doc. 81-2 at 77). He described auditory/visual hallucination and blurred vision in his left eye.

---

[16] Previously, Petitioner declared a medical emergency on October 6, 2009 due to an excruciating headache and complained of lack of sleep for weeks due to pain. Petitioner's Response (Doc. 81-3 at 59). Medical noted "migraine vs. tension headache." Id. at 57. On October 12, 2009, Petitioner was found acting strangely in his cell with glassy eyes and unstable gait and then became unresponsive. Id. at 74. The Emergency Room record mentions the AVM and a directive to transport Petitioner to an outside hospital. Id. at 74, 110.

[17] The Court relies on these referenced attachments to Petitioner's Response (Doc. 81) for the limited purpose of equitable tolling; otherwise, for Petitioner's claims set forth in the Petition, the Court relies on the record before the state court as AEDPA limits review of the factual determinations of the state court to the evidence presented in the state court proceedings. Cullen v. Pinholster, 563 U.S. 170 (2011).

Id.  On November 25, 2009, Petitioner continued to complain of headaches. Id. at 72.  Accounting for some time to recover from brain surgery, Petitioner then suffered significant mental health crises in January 2010, that resulted in his placement in SHOS and a chronic clinic, and this mental state apparently continued through April of 2010 as he had another mental health crisis on April 22, 2010.  Id. (Doc. 81-3 at 142-44, 149-54).  On January 4, 2010, post-craniotomy, Petitioner had visual difficulty and was still on Dilantin.  Id. (Doc. 81-2 at 63).  The record demonstrates Petitioner underwent a seizure assessment and was taking Dilantin, an antiseizure medication, and Wellbutrin, an antidepressant, on April 5, 2010.  (Doc. 30-3, Vol. 2 at 79).  He expressed "auditory/visual hallucination" as well.  Id.

Any period of time exceeding the one-year limit should be equitably tolled as a result of Petitioner's mental illness and brain defect which constitutes an extraordinary circumstance preventing Petitioner from timely filing his federal petition.  The Court is convinced that Petitioner's mental condition and the brain defect caused his failure to file a timely petition. Petitioner's behavior was and is erratic, manipulative, and paranoid with displays of anger, aggression, and ever-changing, inconsistent, and contrary decision-making.  This coupled with the brain defect, brain bleeds, brain

surgery and the aftermath of the brain surgery convinces the Court that this is "a 'truly extreme case'" warranting equitable tolling.  Lewis v. Howerton, No. 1:07-CV-2803-JEC-WEJ, 2012 WL 4514044 (N.D. Ga. Sept. 30, 2012) (not reported in F.Supp.2d) (citing Holland v. Fla., 539 F.3d 1334, 1338 (11th Cir. 2008)), affirmed, 641 F. App'x 878 (11th Cir.), cert. denied, 137 S. Ct. 132 (2016).

Petitioner meets the standard of reasonable diligence as Petitioner's mental illness combined with his brain defect yields a very low bar for what level of diligence is reasonable.  Id. (citing Myers v. Allen, 420 F. App'x 924, 928 (11th Cir. 2011)).  Petitioner is not expected to demonstrate maximum feasible diligence.  Holland, 130 S. Ct. at 2565.  Although Petitioner made attempts to involve himself in the litigation, these attempts were sporadic, unpredictable, with disabling manifestations of his mental illness, including suicidal ideation, self-mutilation, hallucinations, paranoia, severe depression, anger, and rage.

As noted by the trial court, "[h]istorical records indicate that the Defendant was removed involuntarily from two nursery schools, was removed from the first grade and was placed in an emotionally handicapped school at a very early age.  Defendant was uncontrollable and was moved to North

Florida Hospital." Ex. at 0759. A February 26, 1983 discharge summary from Northeast Florida State Hospital not only references ADD with hyperactivity but includes a diagnosis of childhood schizophrenia. Ex. at 1843.

The Court recognizes that Petitioner is literate and of average intelligence, but he suffers from chronic mental illness and has a brain defect accompanied with brain bleeds and seizures rendering him symptomatic and unstable, hindering his ability to successfully prosecute a post-conviction proceeding, with or without counsel. Here, Petitioner has conclusively shown that his mental illness, brain defect, and serious neurological events interfered with his ability to appreciate his litigation position and make rational decisions regarding the litigation. As such, Petitioner has established a causal connection between his alleged mental incapacity and his ability to file a timely federal petition.

Of importance, the record shows Petitioner was not incompetent, and the issue of competency will be addressed separately. As for his post-conviction counsel, there was no professional misconduct. Holland, 560 U.S. at 649 (professional misconduct could amount to egregious behavior and create an extraordinary circumstance). The record demonstrates, once appointed, Mr.

28

Doss attempted to protect his client's rights.   Although he let a significant amount of time pass, he timely filed a Rule 3.851 motion.   Counsel was frustrated in his efforts to file a signed amended Rule 3.851 motion and sought an extension of time for a competency proceeding, prompting the circuit court to appoint experts and undertake a competency review.   Mr. Doss did not perform deficiently in this regard.   When Petitioner successfully dismissed his post-conviction proceeding and had counsel discharged, Mr. Doss, although at that point discharged counsel, filed a timely notice of appeal and appellate briefs.[18]   Gill v. State, 107 So.3d at 327.

Upon review, Petitioner has failed to show Mr. Doss engaged in any serious attorney misconduct qualifying as an extraordinary circumstance. Petitioner has not shown bad faith, dishonesty, divided loyalty, or mental impairment on the part of his counsel.   Cadet, 853 F.3d at 1236. Additionally, this record "does not suggest abandonment or any other form of serious misconduct rising to the level of an 'extraordinary circumstance.'" Robinson v. Jones, No. 1:17cv198-MW-CJK, 2018 WL 6920351, at *4 (N.D. Fla. Nov. 6, 2018) (not reported in F. Supp.), report and recommendation adopted

---

[18]  In state court, Petitioner sought to dismiss his post-conviction proceedings and discharge counsel.   Recently, Petitioner moved to dismiss his federal proceedings as well; however, he ultimately withdrew his pro se motion.   See Docs. 94, 95, 96, 98, 100, 101, 103, 104.

by 2019 WL 77508 (N.D. Fla. Jan. 2, 2019), affirmed by 808 F. App'x 894 (11th Cir. 2020), cert. denied, 141 S. Ct. 2764 (2021) (per curiam).   See Thomas v. Att'y Gen., 992 F.3d 1162, 1167 (11th Cir. 2021), cert. denied, 142 S. Ct. 791 (2022) (asking did counsel abdicate his duty of loyalty to the petitioner to promote his own interests or the interests of others).

On this record there was no misinterpretation of the one-year deadline and even after being discharged, counsel did not walk away from the attorney-client relationship.   See id. at 1183; Cadet, 853 F.3d at 1234 ("Abandonment denotes renunciation or withdrawal, or a rejection or desertion of one's responsibilities, a walking away from a relationship.").   There is absolutely no evidence that Mr. Doss acted in bad faith.[19]   Thomas, 992 F.3d at 1184.   For equitable tolling purposes, there has not been a showing of "professional misconduct" or some other extraordinary circumstance.   Walters v. Sec'y, Fla. Dep't of Corr., No. 3:18-cv-1088-TJC-PDB, 2021 WL 3172120, at * 3 (M.D. Fla. July 7, 2021) (slip op.).   See Holland, 560 U.S. at 651 ("professional

---

[19] Petitioner's assertion that counsel could have done more in his representation by presenting other evidence on incompetency may go to effectiveness of counsel, but it does not evince bad faith or professional misconduct.   Upon review, there was no abandonment by counsel or other serious misconduct.

misconduct . . . could nonetheless amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling").

Petitioner filed a pro se notice of appeal and the FSC anticipated briefs being filed by both counsel and Petitioner, but Petitioner did not file a pro se brief.[20]  Id.   Petitioner did file a motion for rehearing, but after his motion for rehearing was struck, Petitioner only had a few days remaining in his one-year limitation period.[21]   The one-year limitation period expired uninterrupted.

In conclusion, Petitioner has shown that his mental illness and brain condition during the one-year limitation period caused the untimely filing.   He has successfully demonstrated a causal connection between his mental impairment and brain defect and his ability to file a timely petition.   His

---

[20] Petitioner filed an unauthorized motion for rehearing that was struck by the FSC.   Rec. at 4.   To provide context, the Court gives some procedural history.   Apparently, the clerk did not provide Petitioner with a complete copy of the FSC's ruling, so Petitioner wrote letters on October 3, 2012 and on October 22, 2012 attempting to obtain all pages of the ruling from the FSC.   Id. at 30, 32-34.   Of note, he specifically requested a complete copy of the order as soon as possible, "so that I may go forward in mandatory time frame."   Id. at 32 (letter dated October 3, 2012).   Petitioner states he received the full order from the Clerk of the FSC on October 23, 2012 and filed a motion for extension of time to file for rehearing on October 26, 2012, pursuant to the mailbox rule.   Id. at 23-24.   The FSC denied the motion for extension of time to file a motion for rehearing as untimely.   Id. at 22.   Petitioner's efforts to obtain a complete copy of the FSC's decision so he could properly review the decision and file a motion for rehearing evince diligence.

[21] As Petitioner is incarcerated, it likely took a few days for the FSC's January 14, 2013 order striking his motion for hearing to arrive at the prison and be delivered to Petitioner.   For example, Petitioner turned his motion for extension of time over to the prison authorities for mailing on Friday, October 26, 2012, and it was filed with the FSC on Tuesday, October 30, 2012.   Rec. at 23.

mental illness and brain condition is so profound and debilitating that it caused the untimely filing.  As noted above, Petitioner exercised reasonable diligence, and the Court finds extraordinary circumstances prevented timely filing.

Petitioner's case presents a question of equity.  Even after AEDPA, it has been recognized that the dismissal of a petitioner's first federal habeas petition is particularly serious as it severs the protections of the Great Writ, risking untold injury.  See Lugo v. Sec'y, Fla. Dep't of Corr., 750 F.3d 1198, 1217 (11th Cir. 2014) (Martin, J., concurring in judgment), cert. denied, 574 U.S. 1125 (2015).  To avoid the evils of archaic rigidity, the Court has undertaken a more expansive, flexible review of Petitioner's contention that under the specific circumstances of this case he is entitled to equitable tolling, recognizing that the "exercise of a court's equity powers . . . must be made on a case-by-case basis."  Holland v. Fla., 560 U.S. at 649-50 (quoting Baggett v. Bullitt, 377 U.S. 360, 375 (1964)).  See Cole v. Warden, Ga. State Prison, 768 F.3d 1150, 1158 (11th Cir. 2014) (assessment on a case-by-case basis requires consideration of the specific circumstances of the subject case), cert. denied, 575 U.S. 989 (2015).  The Court considers this a truly extreme case warranting "special treatment" and entitlement to equitable tolling.  Holland,

32

560 U.S. at 650.   Therefore, Respondents' Second Motion to Dismiss the
Federal Habeas Petition as Untimely (Doc. 62) will be denied.

As such, the Court will address Petitioner's claims.   To the extent
Petitioner is not entitled to equitable tolling of the limitation period and the
Petition is considered to be time-barred, alternatively, the Court denies relief
because the Petition lacks merit.   The Court further finds that a certificate of
appealability is not warranted.

## V.   HABEAS REVIEW

Federal courts are authorized to grant habeas relief to a state prisoner
"only on the ground that he is in custody in violation of the Constitution or
laws or treaties of the United States."   <u>Lee v. GDCP Warden</u>, 987 F.3d 1007,
1017 (11th Cir.) (quoting 28 U.S.C. § 2254), <u>cert. denied</u>, 142 S. Ct. 599 (2021).
For issues previously decided by a state court on the merits, this Court must
review the underlying state-court decision under the AEDPA.   In doing so, a
federal district court must employ a very deferential framework.   <u>Sealey v.</u>
<u>Warden, Ga. Diagnostic Prison</u>, 954 F.3d 1338, 1354 (11th Cir. 2020) (citation
omitted) (acknowledging the deferential framework of AEDPA for evaluating
issues previously decided in state court), <u>cert. denied</u>, 141 S. Ct. 2469 (2021);
<u>Shoop v. Hill</u>, 139 S. Ct. 504, 506 (2019) (per curiam) (recognizing AEDPA

33

imposes "important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases").

Thus, "[u]nder AEDPA, a court cannot grant relief unless the state court's decision on the merits was 'contrary to, or involved an unreasonable application of,' Supreme Court precedent, or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" McKiver v. Sec'y, Fla. Dep't of Corr., 991 F.3d 1357, 1364 (11th Cir.) (citing 28 U.S.C. § 2254(d)(1)-(2)), cert. denied, 142 S. Ct. 441 (2021).   The Eleventh Circuit instructs:

> A state court's decision is "contrary to" clearly established federal law if the state court either reaches a conclusion opposite to the Supreme Court of the United States on a question of law or reaches a different outcome than the Supreme Court in a case with "materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000).   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle" from Supreme Court precedents "but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. 1495.

Lee, 987 F.3d at 1017-18.   Therefore, habeas relief is limited to those occasions where the state court's determinations are unreasonable, that is, if no fair-minded jurist could agree with them.   McKiver, 991 F.3d at 1364.

This high hurdle is not easily surmounted.   If the state court applied clearly established federal law to reasonably determined facts when determining a claim on its merits, "a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" Shinn v. Kayer, 141 S. Ct. 517, 520 (2020) (per curiam) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).   Also, a state court's finding of fact, whether a state trial court or appellate court, is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).   "The state court's factual determinations are presumed correct, absent clear and convincing evidence to the contrary."   Sealey, 954 F.3d at 1354 (quoting 28 U.S.C. § 2254(e)(1)).   See Hayes v. Sec'y, Fla. Dep't of Corr., 10 F.4th 1203, 1220 (11th Cir. 2021) (Newsome, Circuit Judge, concurring) (recognizing the universal requirement, applicable to all federal habeas proceedings of state prisoners, set forth in 28 U.S.C. § 2254(e)(1)).

## VI.   Claims for Relief

**A.   Claim I:   Mr. Gill's congenital brain malformation and other mental illnesses and defects rendered him incompetent to proceed to trial and to waive numerous rights.   The Court and trial counsel failed to protect Mr. Gill's right to be competent and to be represented by counsel.**

Petitioner claims he was incompetent to stand trial, waive counsel, plead guilty, waive an advisory jury, and waive post-conviction proceedings. Petition at 44. He contends that the trial court, on May 5, 2005, *sua sponte* removed counsel, and counsel failed to effectively challenge his removal or protect Petitioner's rights. <u>Id</u>. In support of this contention, Petitioner states he has a brain defect, a sizable AVM in the anterior temporal lobe area. <u>Id</u>. Petitioner argues that this malformation and damaged area of his brain has caused his impulsive behavior, limited his ability to think rationally, inhibited his ability to communicate with his counsel, and caused him to make decisions that are not in his best interest. <u>Id</u>.

Petitioner relies on <u>Dusky v. U.S.</u>, 362 U.S. 402 (1960) (per curiam) (finding, for competency to stand trial, the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him"); <u>Rees v. Peyton</u>, 384 U.S. 312, (1966) (per curiam) (upon seeking to dismiss a petition for certiorari to review a Court of Appeal's decision, the United States Supreme Court remanded for a determination as to Rees' "mental competence in the present posture of things," asking "whether he has capacity to appreciate his position and make a rational

choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises"); and Drope v. Mo., 420 U.S. 162, 180 (1975) (finding the proceedings inconsistent with the petitioner's right to a fair trial due to the failure to make further inquiry into competence to stand trial).   See Pate v. Robinson, 383 U.S. 375 (1966) (recognizing a due process right to not be tried or convicted while incompetent to stand trial).

Essentially, Petitioner raises a Dusky claim: a substantive competency claim that he was convicted while incompetent.   Petition at 56. Consideration of the claim of entitlement to an evidentiary hearing on this claim is under the relevant standard of proof, which is high.   See Lawrence v. Sec'y, Fla. Dep't of Corr., 700 F.3d 464, 481 (11th Cir. 2012) ("in order to be entitled to an evidentiary hearing on a substantive competency claim . . . a petitioner must present 'clear and convincing evidence' that creates a 'real, substantial, and legitimate doubt, as to his competence.") (quoting James v. Singletary, 957 F.2d 1562, 1571 (11th Cir. 1992)), cert. denied, 569 U.S. 926 (2013).

Respondents address Petitioner's substantive claim of incompetency in their Reply.   Reply at 9-20.   While both the FSC and the state acknowledged that the record was replete with information that clearly established that Petitioner is mentally ill, the FSC further found, "based on the record of competency reviews, reports, and testimony presented in this case," the finding of competency "is supported by competent, substantial evidence and is sufficient to establish Gill's competence to enter a knowing, intelligent and voluntary plea." Gill, 14 So. 3d at 960.   Acknowledging the maxim that once a defendant has been deemed competent, the presumption of competence continues throughout the proceedings, the FSC proceeded to affirm the decision of the circuit court that Petitioner was competent to discharge post-conviction counsel and waive post-conviction proceedings, finding the lower court's decision was supported by competent, substantial evidence.   Gill, 107 So. 3d at 328.

Additionally, Respondents argue these state court factual findings are presumed to be correct under 28 U.S.C. § 2254(e)(1).   Reply at 10.   That is certainly the case; a state court's conclusion regarding competency is entitled to the presumption as well as the state court's conclusion that a defendant was competent to waive his right to further proceedings.   Demosthenes v. Baal,

495 U.S. 731, 735 (1990) (per curiam) (citing Maggio v. Fulford, 462 U.S. 111, 117 (1983)).   Under 28 U.S.C. § 2254(e)(1), Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.

Of note, the claim is not subject to procedural bar and survives the AEDPA statute of limitations.   Johnson v. Singletary, 162 F.3d 630, 637 (11th Cir. 1998) (per curiam), cert. denied, 528 U.S. 883 (1999).   Indeed, "[w]e have both pre- and post-AEDPA precedent, . . . holding that substantive competency claims generally cannot be procedurally defaulted."   Lawrence, 700 F.3d at 481 (citing Pardo v. Sec'y, Fla. Dep't of Corr., 587 F.3d 1093, 1101 n.3 (11th Cir. 2009), cert. denied, 560 U.S. 931 (2010); Wright v. Sec'y, Dep't of Corr., 278 F.3d 1245, 1258-59 (11th Cir. 2002), cert. denied, 538 U.S. 906 (2003); Johnson, 162 F.3d at 637; Medina v. Singletary, 59 F.3d 1095, 1007 (11th Cir. 1995), cert. denied, 517 U.S. 1247 (1996); Adams v. Wainwright, 764 F.2d 1356, 1359 (11th Cir. 1985) (abrogated on other grounds), cert. denied, 474 U.S. 1073 (1986)).

This Circuit has opined that, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."   Medina, 59 F.3d at 1007.   The record is replete with evidence of Petitioner's sometimes bizarre, and often volatile and

irrational behavior.   The record demonstrates Petitioner frequently exhibits anger and readily expresses his paranoia.   But that does not amount to incompetence.

The facts establishing Petitioner's competency are strong.   The trial court revisited the competency/incompetency issue throughout the proceedings; the court appointed experts and had Petitioner examined and/or assessed, even though Petitioner often failed to cooperate.[22]   See Hauser ex rel. Crawford v. Moore, 223 F.3d 1316, 1323 (11th Cir. 2000) (per curiam) (noting the subsidiary findings and the ultimate decision of competency are factual in nature and are entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1)).

To provide context, the Court will provide a brief procedural history concerning the appointments of experts and the related competency evaluations.   At the inception of the Union County case, the court appointed an expert, Elizabeth A. McMahan, at the behest of Petitioner's counsel.   Ex. at 0102.   The prosecutor was not informed of the results.   Id. at 0111-12.

---

[22]  Prior to the Union County case, experts examined Petitioner for an Alachua County case. When Petitioner cooperated and allowed the experts to examine him, the experts found him competent.   Ex. at 1791-94 (Clifford A. Levin, Ph.D., a psychologist, July 14, 2000); Ex. at 0789-91 (Harry Krop, Ph.D., a psychologist, July 24, 2000).

The prosecutor asked for the appointment of experts for mental examination of Petitioner and to determine competency.   Id.   The circuit court appointed Dr. Levin.   Id. at 0115-18.   Petitioner refused to be interviewed by Dr. Levin. Id. at 0130-32.   On December 23, 2002, Dr. Levin submitted a report finding Petitioner competent to proceed, recognizing Petitioner's erratic behavior and lack of cooperation.   Id.

Thereafter, on March 17, 2003, the circuit court appointed three experts to examine Petitioner to determine competency: Dr. Levin; Elizabeth Cadiz, Ph.D., a psychologist; and Dr. Alan Waldman, a forensic psychiatrist.   Id. at 0137.   Although Petitioner refused to be examined by Dr. Levin, Dr. Levin submitted a March 17, 2003 report finding Petitioner competent to proceed. Id. at 0143-44.   Dr. Waldman submitted a report on May 27, 2003.   Id. at 0217-26.   He stated he spent 1.5 hours on the evaluation.   Id. at 0218.   He also found Petitioner competent to proceed.   Id. at 0224-26.

On February 6, 2004, the court *sua sponte* appointed Dr. Krop to determine Petitioner's competency.   Id. at 0342-43.   Thereafter, noting Petitioner's continuing refusal to cooperate with examiners and attorneys, the court appointed three examiners:   Glynn Newman, M.D.,[23] Dr. Krop, and Dr.

---

[23]  Apparently, this was a misnomer as Tonia L. Werner, M.D., a psychiatrist, filed the June

Levin.  Id. at 0399-402.  On May 7, 2004, Dr. Krop submitted a report.  Id. at 0403-404.   Petitioner participated in a limited clinical interview and mental status examination.  Id. at 0403.  Dr. Krop found Petitioner competent to proceed.  Id. at 0404.

Dr. Werner examined Petitioner at Union County Courthouse on June 18, 2004, with Bill Salmon (Petitioner's counsel), Dr. Krop, and Dr. Levin present.  Id. at 0416-19.  She too found Petitioner competent to proceed.  Id. at 0419.  Dr. Waldman submitted a December 23, 2004 report noting a profound neurological finding: an intracranial bleed in early 2004.  Id. at 0479-82.  He provided his impressions:

> I have come to know Ricardo Gill well through the multitude of records that I have read and the one interview I have had with him.  He is an individual who frequently lies, is manipulative with suicidal threats, and in my opinion within reasonable medical certainty, has no purely psychiatric disorder.  Having said this, it is clear that he is suffering from a very serious neurological abnormality, that of an arteriovenous malformation of the left temporal lobe, a condition that will probably take his life within the near future as he is refusing surgery.  An arteriovenous malformation, or AVM, is like a birds nest of useless arteries and veins intertangled together.  The walls of these vessels are in some places aneurysm like and ready to burst like a bubble on an innertube.

---

18, 2004 report.   Ex. at 0416-419.

42

Id. at 0481-82.   Though he did not find exculpation from the physiologic ramifications of the AVM, Dr. Waldman said the malformation is "a very strong mitigator[.]" Id. at 0482.

The court again appointed Dr. Cadiz to conduct a competency evaluation. Id. at 0502-503.   She submitted her report on April 14, 2005.   Id. at 0528-39. Her recommendation regarding competency to proceed was as follows: "Mr. Gill has a factual understanding of the legal proceedings.   He does not have a rational awareness of the meaning and consequences of his case.   He currently depends on other inmates to guide and assist his decision-making."   Id. at 0538.   Her recommendation regarding restorability was ongoing weekly therapy for several years.   Id.   The court considered Dr. Cadiz's report to be ambivalent in its failure to determine whether Petitioner is competent or incompetent.   Id. at 1304.

On April 15, 2005, the court found Petitioner competent to proceed based on the reports of the three experts who previously examined Petitioner on June 18, 2004.   Id. at 1309.   Significantly, post-plea and before sentencing, the court conducted a hearing on February 1, 2006, and received the testimony of Dr. Waldman.   Id. at 1445-71.   Dr. Waldman found: "Mr. Gill is competent to proceed."   Id. at 1452.   Dr. Waldman explained that Petitioner has an

impaired conscience, but he has no impairment in his knowledge of knowing what is right and what is wrong.   Id. at 1470-71.   Dr. Waldman noted Petitioner is an intelligent man; however, he is wired to do things that satisfy himself and himself only.   Id. at 1471.   Dr. Waldman said Petitioner made the statement that he would kill again of his own volition, not based on "knowledge issues about knowing right from wrong," but due to lack of caring as a result of being a "neurologically based sociopath."   Id.

The record shows Petitioner was repeatedly examined and found to be competent, including at the time he waived counsel, pled guilty, waived an advisory jury, and waived post-conviction proceedings.[24]   The Court finds Petitioner has not met his high burden.   Petitioner is intelligent.   He can be volatile and very intentionally manipulative.   He also frequently changes his mind and his position.   He obviously understood the charges and could assist counsel if he chose to do so.   Petitioner has not presented clear and convincing evidence creating a real, substantial, and legitimate doubt as to his competence to stand trial; therefore, he is not entitled to an evidentiary hearing.   Medina, 59 F.3d at 1007.   The evidence Petitioner has presented does not positively,

---

[24] The only anomaly was Dr. Cadiz's report, which the trial court found to be ambivalent and inconclusive in all respects and unpersuasive on the issue of competency/incompetency.

unequivocally, and clearly generate legitimate doubt as to his competence at the time he entered his plea or at the other relevant stages of the criminal proceedings. Id. at 1111 (citation omitted). Of course, the circuit court relied upon its independent observation and interactions with Petitioner as well. The record supports a finding that Petitioner was competent when he entered his plea as he had the ability to consult with counsel (if he desired to consult with counsel) with a reasonable degree of rational understanding and had a rational as well as factual understanding of the criminal proceedings against him.

Of import, the FSC found, "based on the record of competency reviews, reports, and testimony presented in this case, we conclude that the trial court's finding of competency is supported by competent, substantial evidence and is sufficient to establish Gill's competence to enter a knowing, intelligent and voluntary plea." Gill 14 So. 3d at 960. Additionally, the FSC found the trial court's determination was supported by competent substantial evidence that Petitioner was competent to discharge post-conviction counsel and waive post-conviction proceedings. Gill, 107 So. 3d at 328.

This Court is restricted in its review as AEDPA limits review of factual determinations to the evidence presented in the state court proceeding.

Cullen v. Pinholster, 563 U.S. at 182 ("This backward-looking language requires an examination of the state-court decision at the time it was made."). It is not as if the factual predicate of Petitioner's claim could not have been previously discovered through the exercise of due diligence.[25]   28 U.S.C. § 2254(e)(2)(A).   Furthermore, there has been no new and previously unavailable rule of constitutional law made retroactively applicable to consider.   Shoop v. Twyford, 142 S. Ct. 2037, 2044 (2022).   Petitioner's

---

[25]  Petitioner suffered a brain bleed in 2004, and testing revealed an AVM on his left temporal lobe.  Petitioner declined surgery, but he eventually received radiation in January, 2006. In December 2005 and February of 2006, he moved to withdraw his July 8, 2005 plea. Significantly, for this Court, the trial court did not ignore this serious neurological event and its ramifications for the criminal case, noting "primarily of concern to me regards a malformation in your brain that may relate to some of the actions that you have taken that are before the Court."  Ex. at 1439.  As such, on February 1, 2006, before the sentencing proceeding in June of 2006, the circuit court took the testimony of Dr. Waldman.  Id. at 1445. Dr. Waldman attested: "It is my opinion beyond a reasonable medical certainty that **Mr. Gill is competent to proceed**."  Id. at 1452 (emphasis added).  Dr. Waldman explained that a year prior to his testimony, he became aware of the existence of a physiological abnormality in Petitioner's brain.  Id. at 1453.  He explained that Petitioner had a bleed and had suffered "a transient partial hemiparalysis of the right side of his body."  Id.  Dr. Waldman opined that the AVM is "pressing upon the amygdala[,]" which can result in rage attacks, seizures, and interictal personality disorder.  Id. at 1456-57.  He further explained that the amygdala is an essential part of the conscience.  Id. at 1457.  The doctor found no evidence that Petitioner was having temporal lobe seizures, which may induce interictal personality disorder.  Id. at 1462.  He explained the AVM is a congenital abnormality, which Petitioner probably had since birth, and Petitioner had exhibited behavioral abnormalities since childhood.  Id. at 1464.  As such, Dr. Waldman could state "with a reasonable degree of medical certainty that [the existence of the AVM] was probably a factor in Ricardo Gill being the human being that he is today as opposed to a different human being, but a factor."  Id. at 1466.  Dr. Waldman concluded his testimony by explaining that damage to the amygdala potentially renders an individual with an impaired conscience along with an impaired ability to learn from life's experiences.  Id. at 1469.

allegations do not generate a substantial and legitimate doubt as to his competence to stand trial, waive counsel, plead guilty, waive an advisory jury, and waive his post-conviction proceedings.[26]

Alternatively in part, concerning the issue of competency for post-conviction proceedings there is a fundamental problem with this portion of Petitioner's claim: an asserted constitutional error in a post-conviction proceeding is not cognizable on federal habeas review.   Alston v. Dep't of Corr., Fla., 610 F.3d 1318, 1326 (11th Cir.) (this type of challenge does not attack the validity of the fact or length of confinement but rather concerns a state matter on collateral proceedings, a state created right), cert. denied, 562 U.S. 1113 (2010).   See Walsh v. Sec'y, Dep't of Corr., No. 4:16-cv-531-WS-GRJ, 2019 WL 2505074, at *13 (N.D. Fla. May 1, 2019) (not reported in F. Supp.) (same), report and recommendation adopted by 2019 WL 2503826 (N.D. Fla. June 17, 2019).   Thus, the finding of competency to waive post-conviction proceedings fundamentally concerns: "the state's application of its own post-conviction procedures[.]"   Id.   Indeed, "defects in state collateral proceedings do not

---

[26] In a previous first-degree murder case Petitioner was appointed five experts and each expert found Petitioner competent to proceed.   Gill, 14 So. 3d at 953.   The judge in the Union County case was aware of these evaluations and determinations, including in-depth evaluation of medical records and records of Petitioner's early mental health history.   Id.

provide a basis for habeas relief." Carroll v. Sec'y, DOC, 574 F.3d 1354, 1365 (11th Cir.) (citations omitted), cert. denied 558 U.S. 995 (2009). See Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (per curiam) (a due process claim challenging errors in a post-conviction proceeding does not state a claim for habeas relief). This claim is due to be denied. See Jeffus v. Sec'y, Fla. Dep't of Corr., 759 F. App'x 773, 776 (11th Cir. 2018) (per curiam) (finding claims concerning alleged defects in subsequent habeas proceedings are not cognizable under § 2254 as they do not undermine the legality of the petitioner's detention or conviction); Smith v. Jones, No. 3:14cv195/MCR/EMT, 2015 WL 521067, at *5 -*6 (N.D. Fla. Feb. 9, 2015) (not reported in F.Supp.3d) (same). As such, Petitioner is not entitled to habeas relief on this ground.

Assuming otherwise, the Court concludes from the record that Petitioner has not demonstrated by clear and convincing that the state court's findings were not fairly supported by the record. Ferguson v. Sec'y for the Dep't of Corr., 580 F.3d 1183, 1221 (11th Cir. 2009), cert. denied, 560 U.S. 949 (2010). Upon a thorough review, the record demonstrates that there is ample support for the state court's finding that Petitioner was competent to waive post-conviction counsel and post-conviction proceedings.

Petitioner presents two contentions: (1) "Mr. Gill was incompetent when he waived post-conviction proceedings, including challenges to his death sentence[;]" and (2) "[p]ost-conviction counsel ineffectively failed to properly demonstrate Mr. Gill's incompetency resulting in a failure to exhaust ineffective assistance of counsel claims." Petition at 86. The second issue is raised as cause for failure to exhaust, not as an independent claim for relief. Id. at 104-107. As the Court has decided to consider the claims presented in the Petition, the Court will not address the second issue concerning whether the alleged ineffectiveness of post-conviction counsel serves as cause sufficient to excuse procedural default of an unexhausted claim.

Whether Petitioner was incompetent to waive post-conviction proceedings was a matter assessed by the circuit court. The court appointed two experts, Dr. Krop and Dr. Brian Cooke, a forensic psychiatrist, to examine Petitioner and report whether Petitioner has the capacity to dismiss his pending post-conviction proceedings and to discharge collateral counsel. Ex. 2587-89. Subsequently, Dr. Cooke and Dr. Krop filed relevant reports. Id. at 2599-2609. Once again, cooperation was an issue. Petitioner refused to be interviewed by Dr. Cooke, and the doctor declined to render an opinion. Id. at 2601, 2604. Dr. Krop evaluated Petitioner on May 25, 2011. Id. at 2607.

49

Dr. Krop found that Petitioner is not suffering with any major mental illness and is competent to proceed.  Id. at 2609.  Dr. Krop recognized that Petitioner "may change his mind in the future," but his thought processes were "rational and reality based."  Id.

A full-blown competency hearing was conducted by the court on June 30, 2011.  Id. at 2665-2737.  Dr. Cooke examined Petitioner on June 30, 2011, prior to the hearing.  Id. at 2674-75.  Dr. Cooke expressed his opinion that with a reasonable degree of medical certainty Petitioner is competent to dismiss counsel and his right to appeals.  Id. at 2678.  Dr. Cooke explained how he arrived at his opinion.  Id. at 2678-79.  Dr. Cooke attested that Petitioner told him he did not want to spend the rest of his life in prison.  Id. at 2679.  Dr. Cooke set forth all of the evaluations he reviewed prior to making his own assessment and evaluation.  Id. at 2689-90.

Dr. Krop, a psychologist who had evaluated Petitioner on numerous occasions, also testified at the competency hearing.  Id. at 2692-2706.  Dr. Krop evaluated Petitioner at the prison on May 25, 2011 and saw him again prior to the hearing.  Id. at 2694.  Dr. Krop found Petitioner competent to proceed "in all of the proceedings and deal with all of the issues that would be necessary in any type of post-conviction hearing."  Id. at 2696.

Upon inquiry, Dr. Krop explained that he was familiar with the FDOC's records from his past encounters with Petitioner.  Id. at 2698.  Dr. Krop has found Petitioner to be of average or above average intellect.  Id.  Dr. Krop explained, competency is a present issue, as opposed to a past issue, and Dr. Krop found Petitioner at his "most mature, most responsible, the most logical, and the most intelligent, . . . that I've ever seen."  Id. at 2701.  Dr. Krop said Petitioner's affect was "totally appropriate."  Id.  Id.  Dr. Krop believed Petitioner was capable of making a rational decision, but related that he may change his mind later on.  Id. at 2703.  Finally, Dr. Krop said Petitioner has the "rational ability" to choose not to communicate with someone.  Id. at 2705. This does not mean: "it's the best choice on his part[.]" Id.  Dr. Krop also described Petitioner's trust issues, but clarified that this is not "a delusional issue."  Id. at 2706.

The court conducted an extended inquiry of Petitioner concerning his decision to discharge counsel and his post-conviction proceedings.  Id. at 2709. Petitioner told the court that he preferred that the death penalty be imposed and enacted, that all post-conviction proceedings stop, and that the time limits run out.  Id. at 2711-12.  Petitioner said he did not want an attorney to represent him or to proceed to the federal courts.  Id. at 2712-15.  He

confirmed that he understood the death penalty would be enacted.  Id. at 2718-19.

Petitioner testified that he understood what he was giving up by dropping his post-conviction proceedings.  Id. at 2726.  He acknowledged that he would not be able to change his mind.  Id. at 2727.

The circuit court entered its order dismissing the post-conviction proceedings and discharging post-conviction counsel.  Id. at 2640-42.  The court mentioned the appointment of experts, but stated that the court did not make the appointments based on any belief by the court that Petitioner was incompetent.  Id. at 2640.  The court found Petitioner's testimony well-supported the finding of competency by the two experts.  Id. at 2641.  Finally, the court noted that given the opportunity, Petitioner declined to revoke his request to dismiss his post-conviction proceedings and discharge counsel.  Id.

The FSC affirmed the decision of the circuit court, noting the lower court had held a combined competency, Faretta, and Durocher hearing.  Gill, 107 So. 3d at 327.  Finding Petitioner merely wished to set aside his waiver because he changed his mind, the FSC affirmed the decision of the circuit court opining the lower court's finding of competence was supported by competent, substantial evidence.  Id. at 328.

The record demonstrates the trial court repeatedly appointed experts to conduct competency proceedings. As Petitioner was often uncooperative, these experts were at times unable to assess Petitioner's mental state, made assessments based on limited evaluations, or were able to conduct thorough evaluations with Petitioner's cooperation. Prior to sentencing, after the brain bleed and radiation treatment, the court mindfully asked for another assessment by Dr. Waldman as to Petitioner's competency. Once again, Dr. Waldman found Petitioner competent to proceed.

Petitioner also contends that defense counsel and the court erred by relying on stale findings and by failing to recognize that competency is a fluid matter. Petition at 62-71. In essence, Petitioner is complaining that the circuit court declined to rely on the ambivalent and inconclusive assessment rendered by Dr. Cadiz. Instead, the court relied on the three previous assessments rendered by Dr. Werner, Dr. Krop, and Dr. Levin. Assuming arguendo competency is a fluid matter, after the plea proceeding but before sentencing, Dr. Waldman still found Petitioner competent to proceed while acknowledging significant neurological events and Petitioner's brain defect.

The record shows, during post-conviction proceedings, the court appointed experts. Dr. Krop again found Petitioner competent to proceed.

Ex. at 2609.   Dr. Cooke agreed.   Id. at 2690-91.   Thereafter, Dr. Krop

confirmed his original assessment.   Id. at 2696.   The court was convinced

that Petitioner's testimony at the evidentiary hearing well supported the

competency findings of the experts.   Id. at 2640-41.

Additionally, Petitioner claims a deprivation of due process of law.

Petition at 58-62.   Petitioner complains that the June 18, 2004 assessment

and hearing were improperly characterized as a competency proceeding and

the court should have ordered a competency hearing.   See Pate v. Robinson,

383 U.S. 375 (1966) (the trial court erred by not ordering a competency

hearing).   He argues that the examination and evaluation by three mental

health experts at the Union County Courthouse was insufficient and failed to

comply with due process of law.

Upon review, the record demonstrates that the state court was dealing

with a recalcitrant defendant who sometimes refused to cooperate with his

counsel or would not allow mental health professionals to conduct clinical

interviews, examinations, and evaluations.   It is quite evident that Petitioner

is suspicious, paranoid, and manipulative.   As such, he often refused to meet

with the experts or submit himself to mental status evaluations.   Thus, the

circuit court, in an effort to obtain a competency assessment, elected to have

54

mental health evaluations conducted at the state courthouse in the hope that with counsel present and with Petitioner already in attendance at the proceeding, the evaluations would take place.   The court's innovative procedure proved fruitful as the experts were able to meet with Petitioner and conduct mental status examinations.   Ex. at 0416-419.

As Dr. Werner opined after the evaluation:

> At the time of my meeting with him, Mr. Gill was cooperative with the interview process.  He displayed logical thinking, which enabled him to engage in a logical, coherent and goal-directed discussion of his current legal situation.   He does relate an understanding of the general charges against him. As evidenced by his interactions with the clinicians and his attorney, he is able to establish and maintain a collaborative relationship with his attorney.  He is able to manifest appropriate courtroom behavior.   He demonstrated the ability to bring relevant information to the attention of his attorney, testify meaningfully or be cross-examined, understand instructions and advice, or make rational decisions after considering his options.   It is the opinion of this examiner, with a reasonable degree of medical certainty; the defendant is competent to stand trial.

Id. at 0419.

Although this might not be the optimal location, time, or depth of a competency evaluation, attempts to have Petitioner evaluated at the FDOC often proved unsuccessful or curtailed due to Petitioner's refusal to attend the

evaluation or cooperate fully with examiners.   Although the courthouse evaluations may have been unusual, they were uniquely set up to accommodate Petitioner's special needs in an atmosphere unlike a prison or jail, and to allow for defense counsel's attendance.

Petitioner's Pate claim provides no basis for habeas relief.   He was examined and evaluated numerous times and was found mentally competent to proceed.   Also of note, the circuit court was aware that Petitioner had previously been tried for murder and found to be competent in those proceedings as well.   This is not a case where the state court, when presented with information that raises a doubt as to a defendant's competency, fails to act.   Here, the court acted over and over again, appointing experts and conducting hearings in an attempt to ensure Petitioner's procedural due process rights.   See Johnston v. Singletary, 162 F.3d at 634 (citing James v. Singletary, 957 F.2d 1562, 1570 (11th Cir. 1992)).

Upon review, the record shows the court conducted a competency hearing on June 18, 2004 and continued to receive reports, although the court found Dr. Cadiz's report ambivalent and inconclusive.   As such, there was no failure to hold a competency hearing as required by Pate.   See Faulkner v. Jones, No. 3:14cv373/MCR/CJK, 2016 WL 5019198, at *13 (N.D. Fla. May 24, 2016) (not

reported in F. Supp.) ("A <u>Pate</u> claim is necessarily confined to information before the trial court before and during the plea proceeding or trial."), <u>report and recommendation adopted by</u> 2016 WL 5024200 (N.D. Fla. Sept. 16, 2016). Nothing at the plea proceeding indicates Petitioner's behavior or conduct at that time raised a bona fide doubt as to competence to proceed.   Ex. at 1361-1435.   Also of import, the court sought additional testimony from Dr. Waldman on February 1, 2006 regarding Petitioner's post-plea surgery for the AVM and whether Petitioner maintained competence.   Ex. at 1437-75.   Dr. Waldman attested that Petitioner is competent to proceed.   <u>Id</u>. at 1452.

Petitioner claims the trial court and trial counsel failed to protect Petitioner's right to counsel.   Petition at 72-76.   He submits that the trial court abruptly allowed Petitioner to represent himself, although at a previous hearing, the court had denied Petitioner's request to discharge counsel and obtain other counsel and deferred ruling on Petitioner's additional request to represent himself.   Ex. at 1229-94.   The subsequent proceeding about which Petitioner complains took place in Gilchrist County on May 5, 2005.   <u>Id</u>. at 1590.   The court found Petitioner competent to waive counsel, allowed Petitioner to waive counsel, and appointed Mr. Salmon as standby counsel. <u>Id</u>. at 1590-1604.   The court noted that Petitioner "is remaining silent on his

own volition." Id. at 1591-92.   At one point in the proceeding, Petitioner spat upon his counsel and counsel was excused from the courtroom for a moment.[27] Id. at 1600-1601.

The court advised Petitioner that he was preparing an order for Union County denying his motion for a Nelson[28] inquiry as the court found Mr. Salmon was not failing to represent Petitioner in any way, the court granted the motion for a Faretta hearing (referring back to the Union County hearing), concluded that "**you have waived your right to counsel**, and that your waiver of counsel is – that you are competent to make such a waiver." Id. at 1600 (emphasis added).   The court directed that Petitioner would represent himself and have Mr. Salmon as standby counsel. Id. at 1601.   Upon his return to the courtroom, the court apprised Mr. Salmon of the court's rulings and told Mr. Salmon he would be acting as standby counsel. Id.

Although abrupt, it was not the court's final decision on the matter of whether Petitioner desired to have counsel represent him and whether counsel would be appointed or reappointed.   The court was ready and willing to revisit

---

[27] This Court notes that in some proceedings Petitioner was required to wear a spit mask and/or an electronic belt.   Ex. at 0145, 0153, 1371.

[28] Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973).

the matter at the plea proceeding which took place on July 8, 2005.   Id. at

1361-1435.   The following inquiry took place:

> THE COURT:   I have appointed attorneys for
> you to represent you throughout these proceedings,
> but by your own request I have – by your own request,
> you are representing yourself, and I simply ask those
> attorneys to remain as stand-by attorneys if you at any
> time wanted or requested their help.
>
> I want to remind you again that you are entitled
> to have legal representation throughout this trial, or
> throughout this proceeding, including today.   Do you
> wish to have your attorneys represent you today?

Id. at 1364-65.   Petitioner responded in the negative.   Id. at 1365.   The court

found Petitioner competent to proceed, noting the court's two-year observation

of Petitioner and the court's extensive file review of the Union County murder

case   and   the   Alachua   County   murder   case,   including   psychological

examinations   that   consistently   found   Petitioner   competent,   with   one

exception: the ambivalent assessment of Dr. Cadiz.   Id. at 1390.

Again, at sentencing, the court asked if Petitioner wanted to explore the

possibility of appointing new attorneys.   Id. at 1484.   The court inquired:

> THE   COURT:      But   to   me   the   important
> question is are you satisfied that the answers – the
> questions and answers that we went through during
> the Faretta hearing were correct, that is that your
> answers were truthful?

THE DEFENDANT:   Yes.

THE COURT:   And you still wish to go forward this morning, even though there may be a question in your mind as to counsel that was originally appointed for you?

THE DEFENDANT:   Yes.

THE COURT:   And then there was – is there anything else you want to say or tell me about this particular issue that's raised in your motion that was filed in December of 2005?

THE DEFENDANT:   No.

Id. at 1486.  Petitioner was adamant that he only wanted standby counsel, and wanted assistance only if he requested it from counsel.   Id. at 1488-89.

For the sentencing phase, the court inquired:

THE COURT:   Since we are at another new stage of the trial and I think everyone would say this is maybe the most important, I do have the responsibility to advise you that you do have the right to have an attorney represent you in this matter.   And so you are so advised.   Do you wish to have an attorney represent you this morning?

THE DEFENDANT:   No.

Id. at 1490, 1492.   The court proceeded to ask numerous questions of Petitioner, again explaining how an attorney may be beneficial, but Petitioner reassured the court he did not want any attorney.   Id. at 1492-93.   Finally,

60

the court inquired, "[i]s there anything, whether it's legal or just a gut feeling that you have, that make you think you should have an attorney at this point?" Id. at 1493.  When Petitioner hesitated and asked if the court was going to appoint Mr. Salmon, the court clarified it was not Mr. Salmon, but "[a]ny attorney." Id. at 1494.  Petitioner still responded in the negative.  Id.  See Gill, 14 So. 3d at 961 (Petitioner told the court he did not wish to have counsel represent him).

Petitioner made it clear to the court that he only wanted Mr. Salmon's assistance upon request as stand-by counsel.   Petitioner was adamant that he did not want Mr. Salmon appointed or any counsel appointed to represent him. The court abided by Petitioner's request finding Petitioner competent to proceed and to represent himself pro se.

On this record, it is quite apparent that the circuit court went to great lengths to assure Petitioner that the court would appoint counsel if Petitioner desired to have counsel appointed.   Once appointed as stand-by counsel, Mr. Salmon's role was severely restricted.   The court directed that he stand-by and be available if Petitioner wanted or requested his help.   To the extent that Petitioner is asserting that Mr. Salmon failed to protect Petitioner's right to counsel and should have done more, the claim has no merit.   Once the court

relegated Mr. Salmon to stand-by counsel his role was limited by the parameters set by the court.[29]

Petitioner is not entitled to habeas relief on his claim that the trial court and trial counsel failed to protect Petitioner's right to counsel.[30]   Extended and repeated efforts were made by the court to ensure that Petitioner's right to counsel was protected.   When Mr. Salmon attempted to take steps to protect Petitioner, Petitioner complained that the court was denying him his right to self-representation.   Ex. at 1488.   Nothing further was required or expected of Mr. Salmon, other than to be available and ready to act as stand-by counsel.

Petitioner also claims that trial counsel rendered ineffective assistance of counsel in failing to investigate and present evidence of Petitioner's incompetence, in failing to protect Petitioner's right to be competent, and in failing to object to counsel's removal from the case.   Petition at 76-82.   As

---

[29] Apparently Mr. Salmon attempted to submit some records on Petitioner's behalf that were included in the state's notebook, but the court declined to review any of the documents submitted by Mr. Salmon.   Ex. at 1487-90.   Although Mr. Salmon's intentions were apparently good, the court determined he had overstepped his bounds as stand-by counsel and the documents would not be considered, abiding by Petitioner's wishes.

[30] Mr. Salmon was not the only counsel appointed for Petitioner in the Union County case. First, Petitioner had an Assistant Public Defender.   Ex. 0041-42.   Next, the court appointed Stephen Bernstein.   Id. at 45-46.   Mr. Bernstein moved to withdraw.   Id. at 0054-55, 0059. On May 17, 2002, the court appointed Lloyd Vipperman.   Id. at 0060.   On January 23, 2004, the court appointed Mr. Salmon.   Id. at 0337.   Finally, Mr. Salmon became stand-by counsel.

noted previously, there was an abundance of evidence that Petitioner was competent to proceed based on numerous evaluations and assessments by experts.    Mr. Vipperman, Petitioner's previous counsel, sought the appointment of an expert to determine competency.   Ex. at 1023-25.   During Mr. Salmon's representation, he reported, on July 18, 2004, that the experts were extremely cooperative with him, and they resolved how to conduct the interview as to competency and make their assessment and evaluations.   Id. at 1154.    Notably, at that point, Petitioner reconsidered his request to represent himself and withdrew his motion to proceed pro se.   Id. at 1156-57.

On February 18, 2005, Mr. Salmon advised the court "of the extraordinary difficulty in working with Mr. Gill at times[.]" Id. at 1260.   Mr. Salmon readily admitted that they once had a working relationship, but it had fallen apart.   Id. at 1261.   At a proceeding on April 15, 2005, although Mr. Salmon agreed with the prosecutor that obtaining additional reports from experts was a beneficial option, Mr. Salmon also recognized that Petitioner, "has a co-equal, constitutional, fundamental right" to represent himself, "an independent decision from [counsel's] obligation to both Mr. Gill and the court." Id. at 1306.

At the suggestion of additional evaluations, Petitioner became quite obstinate and said he would not speak to another expert and asked that a decision be made on what was before the court.   Id. at 1307.   After Petitioner did not get his way in Union County, at a proceeding on May 5, 2005 in Gilchrist County, he became completely recalcitrant and refused to speak in court.   Id. at 1590-1604.

Although in hindsight Petitioner's counsel could have done something different or something more, his performance was not deficient:

> "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 97 L.Ed.2d 638 (1987)). In finding prejudice, the court must determine that the result of the proceedings would have been different considering "the totality of the evidence before the judge or jury." Berghuis v. Thompkins, —— U.S. ——, 130 S. Ct. 2250, 2265, 176 L.Ed.2d 1098 (2010) (quoting Strickland, 466 U.S. at 695).

Kuhns v. Sec'y Dep't of Corr., No. 2:08-CV-163, 2011 WL 1085013, at *6 (M.D. Fla. Mar. 21, 2011) (not reported in F.Supp.2d).   Mr. Salmon's performance did not so undermine the proper functioning of the adversarial process that

Petitioner was deprived of a fair proceeding.   Indeed, Mr. Salmon recognized he was walking a fine line; he wanted to provide representation to his client and present a defense after spending considerable time and effort in preparation of the case; however, Mr. Salmon also acknowledged Petitioner's fundamental right to represent himself.

Claims of ineffective assistance of counsel are "governed by the familiar two-part Strickland standard."   Knight v. Fla. Dep't of Corr., 958 F.3d 1035, 1038 (11th Cir. 2020), cert. denied, 141 S. Ct. 2471 (2021).   Pursuant to this standard, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense.   Strickland, v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).   The reviewer need not address both prongs if a petitioner makes an insufficient showing on one prong.   Id. at 697.

To prevail, a petitioner must successfully show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" as well as show "the deficient performance prejudiced the defendant, depriving him of a 'fair trial, a trial whose result is reliable.'"   Raheem v. GDCP Warden, 995 F.3d 895, 908 (11th

Cir. 2021) (quoting <u>Strickland</u>, 466 U.S. at 687), <u>cert. denied</u>, 142 S. Ct. 1234

(2022).  Also,

> because "[t]he standards created by <u>Strickland</u> and §
> 2254(d) are both 'highly deferential,' . . . when the two
> apply in tandem, review is 'doubly' so.  <u>Harrington [v.
> Richter</u>, 562 U.S. 86, 105 (2011)] (internal citations
> and quotation omitted).  Thus, under § 2254(d), "the
> question is not whether counsel's actions were
> reasonable.  The question is whether there is any
> reasonable    argument    that    counsel    satisfied
> <u>Strickland</u>'s deferential standard."  <u>Id</u>.

<u>Tuomi v. Sec'y, Fla. Dep't of Corr.</u>, 980 F.3d 787, 795 (11th Cir. 2020), <u>cert.</u>

<u>denied</u>, 141 S. Ct. 1721 (2021).

With respect to an ineffective assistance challenge to the voluntariness

of a guilty or no contest plea, a petitioner must show there is a "reasonable

probability that, but for counsel's errors, he would not have pleaded guilty and

would have insisted on going to trial."  <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

The ineffective assistance of counsel may require a plea be set aside on the

ground that it was involuntary because voluntariness implicates not only

threats and inducements but also ignorance and incomprehension.  <u>Finch v.

Vaughn</u>, 67 F.3d 909, 914 (11th Cir. 1995) (citations omitted).

This Court must be mindful that in a post-conviction challenge to a guilty

plea, the representations of the defendant, his counsel, and the prosecutor at

the plea hearing, plus the findings of the judge, constitute "a formidable barrier."   Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).   Indeed, a defendant's solemn declarations in open court carry a strong presumption of verity.   Thus, later contentions by a defendant contrary to the record may be deemed wholly incredible based on the record.

Based on this record, the court found Petitioner to be competent based on numerous competency evaluations and the court's own observations. Petitioner expressed his desire to represent himself, and even when repeatedly offered counsel, he declined counsel.   Finally, Petitioner was adamant that he wanted to plead to the offense.

At the plea proceeding, Petitioner stated he had discussed his decision to plead with his attorneys, although he was representing himself.[31]   Ex. at 1363.   The court reminded Petitioner that he was entitled to counsel, and Petitioner declined representation.   Id. at 1365.   Petitioner expressed his desire to plead.   Id.   The court proceeding to conduct a colloquy.   Id. at 1365-67.

---

[31] The record shows that the court continued to make attempts to protect Petitioner's rights, including the court's appointment of additional stand-by counsel, Mr. John Stokes.   Ex. at 1369.

Petitioner asked that the state present mitigation, and the prosecutor stated that he believed it was the state's responsibility to present the court with mitigation.  Id. at 1367-68.   Although just stand-by counsel, Mr. Salmon did not stand mute.   He asked the court not to begin the sentencing phase, explaining that he and Mr. Stokes felt an obligation to prepare for sentencing and to advise Mr. Gill.   Id. at 1369-71.   Petitioner objected to any representation by Mr. Salmon or his attempts at intervention.   Id. at 1371-72. The court then asked if Petitioner desired to be represented by an attorney, and Petitioner said no.   Id. at 1373.   The court stated it would respect Petitioner's right to represent himself without assistance from counsel.   Id. at 1375.

The court continued its plea colloquy.   Id. at 1375-81.   Petitioner pled guilty.   Id. at 1378.   He stated he was entering his plea "[f]reely, knowing[ly] and intelligently[.]"  Id. at 1381.   The court continued to inquire and then accepted the plea.   Id. at 1381-83.   The prosecutor asked to present a factual basis for the plea, and the court accepted it without objection from Petitioner. Id. at 1384-86.

The prosecutor provided the following:

> The state is prepared to prove that Mr. Gill was adjudicated guilty of a prior first degree murder on

July 20th, 2001, in Alachua County in Case Number 99-2277-A.   He was sentenced to life in prison.

Four days later, on July 24th, 2001, he was in a cell with his cell mate, the victim, Orlando Rosello. He was the only person in that cell with Mr. Rosello for the hours preceding Mr. Rosello's death.

During the time that Mr. Gill was incarcerated and locked in the cell with Mr. Rosello, he strangled him to death.   He used a bed sheet with a knot in it, tied it and strangled Mr. Rosello.

That morning Mr. Rosello was found dead.   Two written confessions were found.   One was found in Mr. Gill's pocket, one was found in the plumbing of the cell, both authored by Mr. Gill and indicating his deliberate and premeditated killing of Mr. Rosello.

Subsequently, post-Miranda Mr. Gill was interviewed and gave a comprehensive and detailed statement, which the state would introduce into evidence in a redacted form.

In Mr. Gill's own words, the state would prove, quoting him:   It only took four days, just like I promised.   I wrapped that sheet around his neck and strangled the sh[ ] out of him.   When I saw blood coming out of his ear and heart still beating, I started punching him in the chest, hoping I could bust his heart, then I tied the sheet in a knot and wrapped his neck with it and left him like that for two hours.

Id. at 1384-85.

Petitioner faces the formidable barrier of his sworn testimony and representation at the plea proceeding.   His solemn declarations will not be

69

taken lightly; they carry a strong presumption of verity.   Petitioner told the court he had spoken with counsel before entering the plea.   Petitioner rejected any further interjection of counsel and declined to be appointed counsel.

Further, Petitioner understood the consequences of his actions.   His attempt to seek to go behind his previously sworn testimony given during the plea proceeding is not well taken.   The record demonstrates that Petitioner was intelligent and lucid, he answered all questions appropriately, he expressed his positions adequately, and he behaved appropriately, respecting courtroom decorum.   He never backed down from his position that he wanted to represent himself and enter a plea, even after several warnings and admonitions from the court.   The record also demonstrates that he understood the ramifications of his actions.[32]   Petitioner, having been found competent to proceed, had the right to make the decisions to decline the assistance of counsel, decline appointment of counsel, to represent himself, and to enter his plea.

---

[32] Previously, Petitioner spent time in prison, received a life sentence for first-degree murder in Alachua County, and announced he did not want to spend his life in prison.   See Ford v. Haley, 195 F.3d 603, 614, 625 (11th Cir. 1999) (finding a petitioner mentally competent to dismiss his habeas petition and counsel in his capital murder conviction and death sentence as it is a rational decision, not the product of mental disease).

Mr. Salmon performed well within the wide range of reasonably competent counsel under prevailing professional norms.   He made a commendable effort as counsel and stand-by counsel to protect Petitioner and his rights.   Some of his efforts proved unfruitful, but it was not for the lack of effort or due to performance that fell outside the norm.   In failing to satisfy the performance prong of <u>Strickland</u>, Petitioner's claim of ineffective assistance of counsel will not prevail.   As such, Petitioner is not entitled to habeas relief.

As the threshold standard of <u>Strickland</u> has not been met, Petitioner has failed to demonstrate that the state court proceeding was fundamentally unfair and his counsel ineffective.   There has been no Sixth Amendment violation under the Constitution.

Finally, Petitioner challenges the voluntariness of his plea and waiver of an advisory sentencing jury.   The FSC's decision concerning the knowing, intelligent and voluntary nature of the plea is entitled to AEDPA deference. The court looked to the standard of competence set out in <u>Dusky</u>, applicable to those who plead guilty as well as to those who proceed to trial.   <u>Gill</u>, 14 So. 3d at 958-62.   Of import, before accepting Petitioner's plea, "the trial court received numerous reports resulting from examinations by five different

71

doctors, including three psychologists, a forensic psychiatrist, and a neuropsychiatrist." Id. at 960.   The FSC found it evident that the trial court's competency finding "is supported by competent, substantial evidence and is sufficient to establish Gill's competence to enter a knowing, intelligent and voluntary plea."[33]   Id.

The Court finds the state FSC's determination is consistent with federal precedent.   The adjudication is not contrary to or an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   As such, AEDPA deference is due, and Petitioner is not entitled to habeas relief.

## B.   Claim II:   The death sentence imposed in this case violates the Eighth and Fourteenth Amendments.

---

[33] Petitioner asserts there was an unknowing, involuntary, and unintelligent waiver of an advisory jury because Petitioner did not know of his rights.   Petition at 85-86.   The record demonstrates otherwise.   There was a very thorough discussion as to whether Petitioner could waive an advisory jury in the penalty phase.   Mr. Salmon argued that Petitioner could not waive.   Ex. at 1387-93.   There was an extensive discussion on the implications of Ring v. Arizona, 536 U.S. 584 (2002) and Apprendi v New Jersey, 530 U.S. 466 (2000).   Ex. at 1394-97.   Petitioner informed the court he had already waived an advisory jury in Alachua County and was prepared to do so again.   Id. at 1402.   The court thoroughly admonished Petitioner as to the consequences of waiving an advisory jury.   Id. at 1402-1405.   Petitioner stated his wish to waive his right to an advisory jury determination and proceed.   Id. at 1404-1405.   The court abided by Petitioner's decision.   The FSC denied relief on Petitioner's assertion that his death penalty was improperly imposed in violation of the principles announced in Ring, finding Petitioner waived a sentencing jury and his waiver was knowing, intelligent and voluntary.   Gill, 14 So.3d at 966-67.   This adjudication is not contrary to or an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts.   Thus, the Court will give deference to the FSC's decision.

In his Petition under Claim II, Petitioner contends the Eighth Amendment prohibits disproportionate sentences and the trial court arbitrarily applied the cold, calculated, and premeditated (CCP) circumstance. Id. at 113-41.   The Court assumes arguendo Petitioner adequately raised an Eighth Amendment claim in the state court.   Of import,

> In Solem v. Helm, 463 U.S. 277, 284, 103 S. Ct. 3001, 77 L.Ed.2d 637 (1983) (emphasis added), the Supreme Court explained: "[t]he Eighth Amendment declares: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' The final clause prohibits not only barbaric punishments, **but also sentences that are disproportionate to the crime committed**." Solem adopted a three-factor test: a sentence may be considered disproportionate to the crime if it is a very hefty sentence for a relatively minor crime, if the defendant is treated more harshly than other criminals in the state who have committed more serious crimes, and if the defendant is treated more harshly than he would have been in any other jurisdiction. Id. at 303, 103 S. Ct. 3001. Solem provides the sentence should be examined to determine if it is proportionate to the crime. Id

Reynolds v. Sec., Fla. Dept. of Corrections, No. 3:17-cv-281-J-25JRK, 2019 WL 11314974, at *6 (M.D. Fla. Mar. 25, 2019) (slip op.) (emphasis in original).

Significantly, the record demonstrates the murder of Orlando Rosello was not a product of rage or lack of impulse control.   There was no frenzy,

panic, or impulsive and reactionary behavior.   As noted by the FSC, there was competent, substantial evidence to support the finding that the murder was committed in a cold, calculated, and premeditated manner.   <u>Gill</u>, 14 So.3d at 962.   Not only did Petitioner plan and calculate, the FSC found there was "no direct connection between the rage that can be associated with the brain lesion and the murder of Orlando Rosello."   <u>Id</u>.

The FSC considered Petitioner's contention that his mental disabilities rendered him incapable of the cool and calm reflection necessary to meet the requirements for CCP, rejected that contention and found the trial court properly found CCP:

> [c]ompetent, substantial evidence demonstrated that the murder of Orlando Rosello was clearly the result of a longstanding plan by Gill, who fashioned a murder weapon in advance and who had ample time to reflect on the proposed murder and abandon the plan, but did not - and the murder was carried out in a cold manner as a matter of course, without pretense of justification.

<u>Id</u>. at 963.

In rendering its decision, the FSC reviewed Petitioner's version of the July 24, 2001 murder, including Petitioner's statements concerning the letters he wrote in advance of the murder foretelling of his plan to murder an inmate, the steps Petitioner took to fashion the murder weapon, and the cold and

calculated method of carrying out the murder while the victim slept.   Id. at 962.   Additionally, the court considered that Petitioner had a period of reflection affording him the opportunity to abandon his plan to murder an inmate.   Id. at 963.   The FSC considered the length of time Petitioner had to reflect on his intended actions of murdering an inmate, the extended opportunity to abandon the plan, and the failure to abandon the plan.   Id. Additionally, the FSC took note that Petitioner procured the weapon in advance, fashioned the weapon from a bed sheet, and killed his cellmate while he slept by strangling him with the torn bedsheet although there was no provocation by the victim.   Id. at 962-63.   Finally, the FSC recognized, the record is devoid of any evidence of a pretense of justification.   Id. at 963.

The question arises as to whether the death sentence Petitioner received is a disproportionate sentence that violates the Eighth Amendment's prohibition on cruel and unusual punishments.   Petition at 13-26.   Indeed, "[p]rotection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the manner of determining a defendant's sentence."   Montgomery v. La., 577 U.S. 190, 206 (2016), as revised (Jan. 27, 2016).   Petitioner claims he is different; as such, he contends the punishment, death, is seriously disproportionate to his

culpability.   He complains the sentencing judge unreasonably discounted the value of mitigation evidence because "[t]he constellation of Gill's congenital brain defect, brain damage, neurocognitive and neurological disorder, and severe mental illness" diminishes Petitioner's abilities compared to those of the average murderer.   Petition at 118.   In particular, Petitioner says the trial court failed to attribute appropriate weight to mental health mitigation.   <u>Id</u>.

Petitioner complains of the trial court's erroneous weighing of aggravating and mitigating evidence affirmed by the FSC.   Petition at 125. He asserts the FSC's decision was unreasonable because it failed to appreciate the magnitude of the mitigation and its worth.   <u>Id</u>.   Petitioner seemingly asks this Court to find the death penalty in this case a disproportionate sentence that should be recalculated to give greater weight to mitigating evidence.   <u>Id</u>. at 118.

This Court will avoid any unnecessary intrusion on the Florida judicial system.   <u>Moore v. Balkcom</u>, 716 F.2d 1511, 1518 (11th Cir. 1983) (finding federal habeas corpus courts are precluded from conducting <em>de novo</em> proportionality reviews), <u>cert. denied</u>, 465 U.S. 1084 (1984).   <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 43-44 (1984) (finding no Constitutional requirement of proportionality review); <u>see also</u> <u>Lindsey v. Smith</u>, 820 F.2d 1137, 1154 (11th

Cir. 1987) (same), cert. denied, 489 U.S. 1059 (1989).   Upon review, the state court's imposition of the death penalty is not a freakish imposition of capital punishment and the FSC's decision does not shock the conscience under the facts of the case.   This is not a case where the imposition of the capital punishment is patently unjust.[34]   As such, there is no entitlement to relief on an Eighth Amendment claim.

To the extent an Eighth Amendment claim was raised and exhausted in the state courts, this Court finds the state court's adjudication of this claim is not contrary to or an unreasonable application of Supreme Court law. Furthermore, the decision made was not based upon an unreasonable determination of the facts.   Therefore, the FSC's decision is entitled to AEDPA deference.

To some extent Petitioner claims the proportionality review violated due process principles.   Petition at 114-15.   In particular, he asserts the FSC unreasonably distinguished the cases Petitioner argued were illustrative of disparate punishment.   Id. at 116.   As the proportionality review conducted

---

[34] Notably, this was Petitioner's second capital proceeding in the Florida courts.   Although he received life for the murder of Moore, he had much greater hurdles to overcome in the murder of Rosello, a threatened, planned, calculated, and unprovoked murder of an unresisting inmate.

77

by the FSC is a matter of state law, this Court may not issue a writ on the basis

of a perceived error of state law.   See Bush v. Singletary, 99 F.3d 373, 375

(11th Cir. 1996) (per curiam) (finding Florida conducted the proportionality

review its law required and no implication of a federal constitutional question).

As such, Petitioner's claim of state law error is not cognizable in this federal

petition for habeas relief and is due to be denied as this Court may not issue

the writ on the basis of a perceived state-court error.

Petitioner also contends that the trial court arbitrarily applied the cold,

calculated and premeditated aggravating circumstance (CCP).   Petition at

126-41.   The FSC addressed Petitioner's claim that his mental disabilities

rendered him incapable of meeting the requirements for CCP.   Gill, 14 So. 3d

at 962.

The FSC presented a thorough and careful review of whether CCP was

present based on a consideration of the totality of the circumstances.   Id.   The

court explained:

> Although Gill was angry at not receiving the death
> penalty in the Beverly Moore murder, that anger was
> expressed not in frenzy, panic or rage, but in a long-
> simmering plan to kill an innocent person.   Dr.
> Waldman, in his testimony presented before
> sentencing, testified that the arteriovenous
> malformation that was present in Gill's brain often
> manifests itself in rage; but when presented with the

> facts of this murder, Waldman saw no direct connection between the rage that can be associated with the brain lesion and the murder of Orlando Rosello.

Id.

The record demonstrates Petitioner admitted to "coldly strangling Rosello while he slept." Id. The record also shows Petitioner wrote letters in advance, had time for reflection, but decided to complete his long-standing plan to kill an inmate, making his final decision on July 24, 2001 when he carried out the murder. Id. at 962-63. There is no evidence of rage or frenzy.

As there is a qualifying state court decision, the Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. The Court concludes that the FSC's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the fact in light of the evidence presented in the state court proceedings.

Petitioner contends that the Eighth Amendment prohibits the execution of persons with intellectual disability, relying on Atkins v. Virginia, 536 U.S. 304, 318-21 (2002) (finding no legitimate penological purpose is served by executing the intellectually disabled and forbidding the execution of persons

79

with intellectual disability), and that he is intellectually disabled.   Petition at

141-48.   In this ground, Petitioner relies on both the Eighth and Fourteenth

Amendments to the United States Constitution:

> The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Fourteenth Amendment applies those restrictions to the States. Roper v. Simmons, 543 U.S. 551, 560, 125 S. Ct. 1183, 161 L.Ed.2d 1 (2005); Furman v. Georgia, 408 U.S. 238, 239–240, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." Roper, supra, at 572, 125 S. Ct. 1183; see also Trop v. Dulles, 356 U.S. 86, 100, 78 S. Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man").

Hall v. Fla., 572 U.S. 701, 707–708 (2014).   See Kilgore v. Sec'y, Fla. Dep't of

Corr., 805 F.3d 1301, 1314 (11th Cir. 2015) (noting Hall created a procedural

requirement for ensuring that states follow Atkins and is not retroactive to

cases on collateral review), cert. denied, 138 S. Ct. 446 (2017).

The record belies Petitioner's contention that he is intellectually

disabled.   Dr. Krop found Petitioner to be of average or above average

intellect.   Ex. at 2608, 2698.   Dr. Waldman found Petitioner to be an

intelligent man, and the trial court concurred.  Id. at 1169, 1471.  Petitioner has "obtained a Verbal IQ of 85."[35]  Id. at 0535.  See Hall, 572 U.S. at 724 (rejecting the rigid Florida law defining intellectual disability to require an IQ test of 70 or less before presenting any additional evidence of intellectual disability).  Petitioner has a high school diploma, attended community college, and took courses in paralegal work.[36]  Id. at 0869.

Petitioner is literate and intelligent and is not suffering from "significantly subaverage general intellectual functioning."  Fla. Stat. § 921.137(1) ("significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18").  Here, Petitioner is essentially asking that this Court extend Atkins to the mentally ill.  Upon review, Atkins has not been extended to the mentally ill or to those with organic brain, damage,

---

[35] Petitioner did not score in the lower range reflecting borderline intellectual functioning, and there was no alleged failure to account for the test's standard error of measurement. Moore v. Texas, 137 S. Ct. 1039, 1049 (2017) (establishing that states cannot disregard current clinical and medical standards in the assessment).  See Smith v. Comm., Ala. Dep't of Corr., 924 F.3d 1330, 1337 (11th Cir. 2019) (Moore is not retroactive as it announced a procedural rule), cert. denied, 141 S. Ct. 188 (2020).

[36] Petitioner exhibited his intelligence and advocacy skills during numerous court proceedings, including the hearing which took place on November 21, 2003, during which he complained that he had not been appointed a qualified death penalty attorney and set forth a strong argument asserting the damage that had been done to his case by the lack of such appointment.  Ex. at 1120-34.  As a result of this proceeding, the trial court announced its intention to appoint substitute registry counsel for Petitioner.  Id. at 1131.

frontal lobe damage, and other psychological disorders.  Lawrence v. State, 969 So. 2d 294, 300 n.9 (Fla. 2007) (per curiam) (declining to extend Atkins to mentally ill); Schoenwetter v. State, 46 So. 3d 535, 562-63 (Fla. 2010) (per curiam) (same).

Of import, in Lawrence, 969 So. 2d at 300 n.9, the FSC rejected the notion that equal protection requires the extension of the holding in Atkins to mental illness:

> In issue four, Lawrence contends that under Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L.Ed.2d 335 (2002), equal protection requires that his mental illness be treated similarly to those with mental retardation because both conditions result in reduced culpability. We reject his assertion that the Equal Protection Clause requires this Court to extend Atkins to the mentally ill. See, e.g., Lewis v. State, 279 Ga. 756, 620 S.E.2d 778, 786 (2005) (declining to extend Atkins to the mentally ill); Tigner v. Texas, 310 U.S. 141, 147, 60 S. Ct. 879, 84 L. Ed. 1124 (1940) (holding equal protection "does not require things which are different in fact or opinion to be treated in law as though they were the same"); State v. Hancock, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-1060 (2006) (declining to extend Atkins to the mentally ill because mental illnesses come in many forms and different illnesses may affect a defendant in different ways and to different degrees, thus creating an ill-defined category of exemption from the death penalty without regard to the individualized balance between aggravation and mitigation in a specific case).

As noted in <u>Carroll</u>, 574 F.3d at 1369, the mental retardation or intellectual disability inquiry "is not different merely because an individual suffers from mental illness."   In short, the Eleventh Circuit held <u>Atkins</u> does not exempt the mentally ill from execution.   <u>See</u> <u>Presnell v. Hall</u>, No. 1:07-CV-1267-CC, 2013 WL 1213132, at *7 (N.D. Ga. Mar. 25, 2013) (not reported in F.Supp.2d) (rejecting habeas petitioner's claim of exemption from execution due to mental illness, declining to extend <u>Atkins</u> to mental illness).

Under <u>Atkins</u>, a petitioner must satisfy two prongs: the intellectual functioning prong and the adaptive behavior prong to qualify.   As such, both significantly subaverage general intellectual functioning along with deficit in adaptive behavior and an onset before age 18 must be satisfied.

Since <u>Atkins</u>, the FSC adopted Florida Rule of Criminal Procedure 3.203. It provides:

> **Definition of Intellectual Disability**.[37] As used in this rule, the term "intellectual disability" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this rule, means performance that is 2 or more standard deviations from the mean score on a

---

37 The Rule previously referred to "Mental Retardation" rather than "Intellectual Disability." Fla. R. Crim. P. 3.203.

> standardized intelligence test authorized by the
> Department of Children and Families in rule 65G–
> 4.011 of the Florida Administrative Code. The term
> "adaptive behavior," for the purpose of this rule,
> means the effectiveness or degree with which an
> individual meets the standards of personal
> independence and social responsibility expected of his
> or her age, cultural group, and community.

Fla. R. Crim. P. 3.203.

Petitioner may have deficits in adaptive behavior; however, he clearly does not satisfy the subaverage intelligence prong. Brumfield v. Cain, 576 U.S. 305, 315 (2015) (citation omitted) (noting an IQ score between 70 and 75 or lower is typically considered the cutoff for subaverage intelligence)). See In re Henry, 757 F.3d 1151, 1155 (11th Cir. 2014) (citation omitted) (due to a plus and minus 5 standard of error an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting evidence concerning difficulties in adaptive functioning). Petitioner's argument really hinges on the adaptive impairment prong, see Petition at 143-44, but again, that is not sufficient, even if satisfied. Also, an argument of someone being "functionally mentally retarded" does not win the day. Carroll, 574 F.3d at 1369.

Petitioner raises a procedural due process claim.[38]   Petition at 144.   As Atkins set forth only a substantive Eighth Amendment claim and no minimum procedural due process requirements, this Court "cannot 'import a procedural burden of proof requirement'" that the Supreme Court did not adopt. Raulerson v. Warden, 928 F.3d 987, 1002 (11th Cir. 2019) (quoting Hill v. Humphrey, 662 F.3d 1335, 1360 (11th Cir. 2011) (en banc)), cert. denied, 140 S. Ct. 2568 (2020).

In ground two, Petitioner also raises a competency to be executed claim under Ford v. Wainwright, 477 U.S. 399, 410 (1986) (holding the Eighth Amendment prohibits the execution of a petitioner who is insane).   Petition at 154-57.   This claim is not ripe for adjudication because the state has not set an execution date.   See Connor v. Sec'y, Fla. Dep't of Corr., 713 F.3d 609, 625 (11th Cir.), cert. denied, 571 U.S. 926 (2013).   As such, the Court declines to address this ground as prematurely raised.

Petitioner submits that the Eighth Amendment, as well as the Equal Protection Clause, prohibit the execution of the severely mentally ill, relying

---

[38] To the extent Petitioner is attempting to raise his incompetence claim as a substantive due process claim (a claim that the petitioner was convicted while mentally incompetent to stand trial), that is a matter to be addressed under competency, not intellectual disability.

on Roper v. Simmons, 543 U.S. 551 (2005) (finding the Eighth and Fourteenth Amendments prohibit the execution of an offender who was under 18 years of age at the time his capital crime was committed); Atkins; and Ford.   Petition at 148-54.   As in Sears v. Chatman, No. 1:10-cv-1983-WSD, 2016 WL 1417818, at *11 (N.D. Ga. Apr. 8, 2016) (not reported in F. Supp.), Petitioner is asking that the Court extend the applicability of Atkins and Roper to him.

Petitioner was born July 2, 1969, Ex. at 1816, and the crime was committed on July 24, 2001.   Id. at 0037.   Thus, he was 32 years of age when the murder was committed and the holding in Roper is inapplicable.   Without a decision from the United States Supreme Court barring the execution of mentally ill prisoners, Petitioner remains subject to execution as he cannot satisfy the first prong of the two-pronged standard under Atkins: the intellectual functioning prong.   The Court declines to address a Ford claim as premature.   See Panetti v. Quarterman, 551 U.S. 930, 959 (2007) (holding the Eighth Amendment prohibits the execution of an offender whose mental illness prevent him from rationally understanding why the state seeks to impose the death penalty).   Indeed, "execution lacks retributive purpose when a mentally ill prisoner cannot understand the societal judgment underlying his sentence." Madison v. Ala., 139 S. Ct. 718, 728 (2019).

Since there is no current legal authority for this Circuit or the Supreme Court of the United States supporting Petitioner's position that the law of the land should prevent the execution of those with "a known mental illness," ground two is due to be denied.   See O'Kelley v. Warden, GDCP, No. CV415-104, 2019 WL 1452514, at *23 (S.D. Ga. Apr. 2, 2019) (not reported in F. Supp.). However, as stated above, the Court will not address the Ford claim as it is prematurely raised.

## C.   Claim III:   The prior conviction aggravating circumstance supporting the death sentence is unconstitutionally vague.

Petitioner relies on the holdings in Johnson v. U.S., 576 U.S. 591 (2015) (finding the definition of prior "violent felony," covering any felony that otherwise involves conduct that presents a serious potential risk of physical injury to another in the residual clause of the Armed Career Criminal Act unconstitutionally vague under due process principles) and Welch v. U.S., 136 S. Ct. 1257 (2016) (holding Johnson is retroactive) to support his contention that Florida's prior violent felony conviction aggravating circumstance is unconstitutionally vague.   Petition at 158.   In Johnson, the Supreme Court succinctly set forth the relevant guiding principles:

> The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." Our cases establish that the

87

> Government violates this guarantee by taking away
> someone's life, liberty, or property under a criminal
> law so vague that it fails to give ordinary people fair
> notice of the conduct it punishes, or so standardless
> that it invites arbitrary enforcement. <u>Kolender v.
> Lawson</u>, 461 U.S. 352, 357–358, 103 S. Ct. 1855, 75
> L.Ed.2d 903 (1983). The prohibition of vagueness in
> criminal statutes "is a well-recognized requirement,
> consonant alike with ordinary notions of fair play and
> the settled rules of law," and a statute that flouts it
> "violates the first essential of due process." <u>Connally v.
> General Constr. Co.</u>, 269 U.S. 385, 391, 46 S. Ct. 126,
> 70 L. Ed. 322 (1926). These principles apply not only
> to statutes defining elements of crimes, but also to
> statutes fixing sentences. <u>United States v. Batchelder</u>,
> 442 U.S. 114, 123, 99 S. Ct. 2198, 60 L.Ed.2d 755
> (1979).

<u>Johnson</u>, 576 U.S. at 595–96.

Petitioner complains that the trial court improperly applied the aggravating factor of a prior capital felony under Fla. Stat. § 921.141(5)(b). Petition at 158-59. He contends that this Florida aggravator requires an examination of the nature of Petitioner's past conduct and whether violence was involved. <u>Id</u>. at 159.

Upon review, Petitioner's claim is without merit. The Florida statute reads: "[t]he defendant was previously convicted of another capital felony *or* of a felony involving the use or threat of violence to the person." Fla. Stat. § 921.141(5)(b). In Petitioner's case, the trial court explicitly found Petitioner:

"had previously been convicted of **another capital felony**."   Ex. at 0750 (emphasis added).   In affirming the conviction and sentence, the FSC noted the trial court considered the aggravating factor of a prior capital felony conviction for the murder of Beverly Moore under that express provision.   Gill, 14 So. 3d at 956.

Petitioner received fair notice that a previous conviction for another capital felony could be considered an aggravating factor and given weight. Moreover, at sentencing, the trial court provided Petitioner with a copy of the judgment and sentence in case no. 01-1999-CF-002277-A, a conviction of the offense of capital murder in Alachua County.   Ex. at 1500.   Petitioner expressed no objection or correction to these state court documents.   Id. at 1501.   The record clearly demonstrates that Petitioner has previously been convicted of another capital felony.

Also, there is an absence of a residual clause that has features that "conspire to make [the Florida statute] unconstitutionally vague."   Johnson, 576 U.S. at 597.   In Johnson, the Supreme Court found the residual clause ("or otherwise involves conduct that presents **a serious potential risk** of physical injury to another") denied fair notice and invited arbitrary enforcement by judges.   In particular, the Supreme Court noted two features

of the residual clause that conspired to make it unconstitutionally vague: (1) how to estimate the **risk posed by a crime**; and (2) **how much risk** does it takes for a crime to qualify as a violent felony.   Id.

The Florida statute does not contain a comparable residual "risk" clause. Therefore, the Court is not convinced that the Florida statute is unconstitutionally vague and invites standardless, arbitrary enforcement and fails to give ordinary people fair notice.   Of import, in Petitioner's case there was no real debate; he had previously been convicted of another capital felony. There was no deprivation of due process of law based on unconstitutional vagueness.   Ordinary people would know that they faced an increased sentence if they had been convicted of a prior capital felony conviction. Finally, the Florida Statute does not contain features that conspire to make it unconstitutionally vague and is distinguishable from the federal statute addressed in <u>Johnson</u> with its residual clause which inherently invited arbitrary enforcement and denied fair notice.   As such, Petitioner is not entitled to habeas relief.

**D.   Claim IV:   Trial counsel rendered ineffective assistance to Mr. Gill's prejudice in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.   *Strickland v. Washington*, 466 U.S. 668 (1984)[.]**

Petitioner claims his trial counsel ineffectively failed to follow up on testing or assessment of Petitioner's brain defect after Dr. Cadiz's report of April 14, 2005.  Petition at 173.  Petitioner argues that Dr. Cadiz "clearly found Mr. Gill incompetent[.]" Id.

In considering Dr. Cadiz's report, Ex. at 0528-39, Mr. Fleck, the prosecutor, said, "Dr. Cadiz does not declare him incompetent." Id. at 1301. Upon inquiry from the court, Mr. Salmon said, "I cannot find a resolution in Dr. Cadiz' report other than ambivalence." Id. at 1303.  After reviewing the report and hearing the assessment of counsel, the court found Dr. Cadiz's report "ambivalent, to say the least." Ex. at 1304.  The other competency reports issued prior to and after Dr. Cadiz's report conclusively found Petitioner to be competent, whereas Dr. Cadiz's report was ambivalent and inconclusive, a shaky foundation for counsel to argue for follow-up testing or assessment.

At that point in the pre-trial proceedings, Petitioner was attempting to discharge his counsel and represent himself; Mr. Salmon was trying to protect Petitioner's rights as his appointed counsel while simultaneously recognizing that Petitioner had the right to conduct his own defense. Id. at 1304-1305. Mr. Salmon explained that he feared Petitioner would implicate himself in an

offense that could result in his death.   Id. at 1305.   As for the possible appointment of additional experts, Mr. Salmon said:

> This court has suggested the appointment of additional experts to address the very thorny issue that Mr. Gill is, as I understand it to this point, still pursuing.   I can't ask this court to address Mr. Gill. **But to the extent that additional reports may afford this court an opportunity to make a conclusive decision on the issue of competency, both with regard to discharging counsel and representing himself, I as Mr. Fleck indicates, certainly would have no objection to that process being undertaken by the court.**
>
> Where that would leave us when those additional reports are received and considered by the court, may have me standing here saying exactly the same thing again, and I don't want to tell the court that I believe that might be irregardless [sic] of what those reports say.
>
> Mr. Gill has a co-equal, constitutional, fundamental right recognized by this country since its inception to do what he has indicated he wants this court to let him do.   That I see as an independent decision from my obligation to both Mr. Gill and the court.

Id. at 1306 (emphasis added).

Thereafter, Petitioner asked to speak to the court, and he told the court he would not be examined by another expert and wanted a decision made without further delay.   Id. at 1307.   Mr. Fleck reminded the court that

Petitioner had not been found incompetent despite his mental illness and Dr. Cadiz's report provided no reason to find incompetency now, and Mr. Fleck agreed with Petitioner that it was time for the court to make its decision.   Id. at 1308.

Petitioner was insistent that he was done speaking with experts and wanted a decision made.   Mr. Salmon made a concerted effort to be both respectful to Petitioner's constitutional right to represent himself and discharge counsel and to protect Petitioner's interests and his defense.   It was a fine and difficult line, particularly with this recalcitrant and defiant client.

In the Petition, Petitioner complains of a failure to further investigate the brain defect.   The record shows post plea and also during post-conviction proceedings, appointed experts continued to find Petitioner competent, including Dr. Waldman, who found the AVM a strong mitigator, but still determined Petitioner was competent to proceed.   Id. at 1452.   During a post-conviction proceeding, both Dr. Krop and Dr. Cooke found Petitioner to be competent to proceed.   The record evinces there was no lack of assessment and counsel did not perform deficiently under these circumstances.

Of course, counsel could have performed differently, but his performance was not deficient.   Indeed, his representation was reasonable under the

circumstances presented.   The record demonstrates he performed within the bounds of reasonable competent counsel.

Petitioner also claims counsel was ineffective for failure to investigate and uncover support for incompetency and intellectual disability.   Petition at 174-77.   The record belies this assertion.   Mr. Salmon told the court, based on his personal history with Mr. Gill and through the use of the defense's investigator, counsel had reviewed "the contents of over 20,000 pages of documentation" from prior records, "multitudinous reports from other doctors who have examined Mr. Gill," and made "extensive efforts to investigate every single aspect of this case[.]" Ex. at 1301.   Furthermore, at sentencing, Mr. Salmon was prepared to submit additional records on Petitioner's behalf, but the court declined to review them as Mr. Salmon was merely stand-by counsel and Petitioner had not sought counsel's assistance or agreed to their submission.   Ex. at 1487-90.   The result was not due to lack of effort on Mr. Salmon's part.

As noted by the FSC, there was a wealth of information before the trial court, obtained by appointed attorneys and derived from the Beverly Moore case, Petitioner's prior murder case.   <u>Gill</u>, 14 So. 3d at 953.   Due to numerous competency examinations over the years there had been "in-depth review of

Gill's medical records and records of his early mental health history," including a review of Petitioner's mental and behavioral problems manifested in childhood, his institutionalization as a youth for mental and behavioral problems, his commitment to Northeast Florida State Hospital, and his prior criminal offenses.[39]   Id.   Thus, the state court had before it voluminous information concerning Petitioner's long history of mental illness and behavioral difficulties, combined with evidence of a serious brain defect and its ramifications.   Id.

There is a strong presumption in favor of competence when evaluating the performance prong of the ineffectiveness inquiry under Strickland.   Upon review, there is substantial evidence that counsel adequately prepared and investigated the case and examined Petitioner's mental health history, even attempting to submit more documentation once he was removed as counsel and acted as stand-by counsel.   Of note, the record shows Petitioner thwarted counsel's efforts to submit additional documentation at sentencing.   Counsel did not make errors so serious that he was not functioning as the counsel guaranteed by the Constitution.

_____

[39] Dr. Krop, in particular, was very familiar with Petitioner's FDOC's records and other institutional records due to numerous encounters with Petitioner.   Ex. at 2698.

Without satisfying the performance prong as set forth in <u>Strickland</u>, Petitioner cannot prevail on his claim of ineffective assistance of counsel. <u>Fifield v. Sec'y, Dep't of Corr.</u>, 849 F. App'x 829, 833 (11th Cir. 20210) (per curiam) (failure to make a sufficient showing on one prong makes renders it needless to address the other prong), <u>cert. denied</u>, 142 S. Ct. 788 (2022).   As the threshold standard of <u>Strickland</u> has not been met, Petitioner has failed to demonstrate that his state court proceeding was fundamentally unfair and his counsel ineffective.   Thus, Petitioner has failed to demonstrate a Sixth Amendment violation under the United States Constitution.

**E.   Claim V:   Mr. Gill's federal constitutional rights were violated by the state's failure to disclose material exculpatory evidence in its possession.   Brady v. Maryland, 373 U.S. 83 (1963)[.]**

In this ground, Petitioner states he is giving notice of a potential claim out of an abundance of caution.   Petition at 178-79.   He provides, "there may be evidence that assists Mr. Gill in proving his case or undermines the prosecution's case."   <u>Id</u>. at 179.   The claim raised in Claim V is not ripe for adjudication, and the Court declines to address this ground as prematurely raised.   The Court expresses no opinion as to whether the suggested claim may be properly or timely raised in a subsequent proceeding.

**F.   Claim VI:   The death sentence was imposed under an unconstitutional capital sentencing scheme[.]**

Petitioner states that he intends to raise this claim in state court, and to accomplish this task, "counsel is filing with this petition a motion requesting the Court's permission to appear in state court for that purpose."   Petition at 179-80.   The record shows that Petitioner's counsel did file a Motion for Authorization to Appear in State Court (Doc. 31).   The Court deferred ruling on the motion.   Order (Doc. 41).   After Petitioner filed a *pro se* Motion to Reappoint Counsel (Doc. 44), the Court denied without prejudice the Motion for Authorization to Appear in State Court.   Order (Doc. 51).   Petitioner's counsel never renewed the motion to appear in state court.   As such, the claim raised in Claim VI is not ripe for adjudication.   The Court declines to address this ground and expresses no opinion as to whether the suggested claim may be properly or timely raised in a subsequent proceeding.

## VII.   Motion

This cause is also before the Court on a Stipulated Motion to Withdraw and Substitute Capital Qualified, Florida-Barred Co-Counsel (Doc. 109). Dana C. Hansen Chavis seeks leave to withdraw from the case and asks that the Court appoint Marie-Louise Parmer, a member of the Florida Bar and a Criminal Justice Act (CJA) panel attorney.   Respondents filed their Objection to Petitioner's Stipulated Motion to Withdraw and Substitute Capital

Qualified, Florida-Barred Co-counsel (Doc. 110) stating no objection to Ms. Chavis withdrawing her representation but asserting that there was no stipulation to either her withdrawal or the appointment of private counsel Marie-Louise Parmer.  Id. at 2.  Respondents object to the appointment of Ms. Parmer and propose the appointment of Capital Collateral Regional Counsel – Northern Region (CCRC-N) in place of Ms. Chavis.  Id. at 7.

The motion will be granted to the extent Dana C. Hansen Chavis seeks leave to withdraw.  In all other respects, the motion will be denied.  See Order (Doc. 22) (appointing the Federal Defender Services of Eastern Tennessee, Inc. Capital Habeas Unit (CHU-ED TN) due to the contention of conflicts of interests).  After Petitioner expressed his preference for the appointment of CHU-ED TN over local CJA counsel, the CHU-ED TN provided the names and qualifications of three attorneys, Dana C. Hansen Chavis, Susanne Bales, and Stephen M. Kissinger, and other staff.  Finding well-qualified attorneys and other staff employed by CHU-ED TN, the Court granted the motion to substitute counsel and granted Petitioner's request to appoint CHU-ED TN to represent Petitioner.  The Court declines to appoint additional counsel at this juncture.[40]

_____

[40] On May 31, 2002, the Eighth Judicial Circuit Court in and for Union County, Florida

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.     Petitioner's Motion for Leave to Reply (Doc. 111) is **DENIED.**

2.     The Court **grants** the Stipulated Motion to Withdraw and Substitute Capital Qualified, Florida-Barred Co-Counsel (Doc. 109) to the extent **Dana C. Hansen Chavis** is **GRANTED** leave to withdraw.   In all other respects, the motion is **DENIED.**

3.     Respondents' Second Motion to Dismiss the Federal Habeas Petition as Untimely (Second Response) (Doc. 62) is **DENIED**.

4.     The Petition for Writ of Habeas Corpus (Doc. 30) is **DENIED**.

5.     The action is **DISMISSED WITH PREJUDICE**.

6.     The **Clerk** shall enter judgment accordingly and close this case.

7.     If Petitioner appeals the denial of the Petition for Writ of Habeas Corpus (Doc. 30),[41] the Court denies a certificate of appealability.   Because

---

appointed CCRC-N as Postconviction Counsel for Petitioner in the underlying criminal case, case no. 63-2002-CF-000028-A.   (Doc. 110 at 10-11).

[41] This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).   Upon due consideration, this Court will deny a certificate of appealability.

this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case.   Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 14th day of October, 2022.

_____
BRIAN J. DAVIS
United States District Judge

sa 10/13
c:
Counsel of Record

100